GAF CORPORATION, Plaintiff,

v.

CIRCLE FLOOR CO., Inc., et al.,
Defendants.

No. 71 Civ. 792.

United States District Court,
S. D. New York.

July 22, 1971.

Winthrop, Stimson, Putnam & Roberts, New York City, for plaintiff; Edwin J. Wesely, Steven A. Berger, New York City, of counsel.

Paul, Weiss, Goldberg, Rifkind, Wharton & Garrison, New York City, for defendant Circle Floor Co., Inc.

Stroock & Stroock & Lavan, New York City, for individual defendants; Charles G. Moerdler, Stephen A. Block, Robert P. Stein, New York City, of counsel.

## OPINION

GURFEIN, District Judge.

There have been many skirmishes between the parties and the war apparently goes on. The procedural history attests to the resourcefulness of all counsel in the proxy battle for control of GAF Corporation (GAF). That particular battle having ended with a victory by the management of GAF, both sides, nevertheless, persist in further action, the individual defendants by continuing a derivative suit against management; the plaintiff by pursuing its action against the defendant Circle Floor Co., Inc. (Circle) for alleged violations of the antitrust laws (Sherman Act, Sec. 1 and Sec. 2, (15 U.S.C. Secs. 1, 2), and Clayton Act, Sec. 7 (15 U.S.C. Sec. 18)). Since either side may have a claim for relief, the motivation of the parties is irrelevant except as it bears on the good faith of allegations made and answers given. See American Mfrs. Co. v. American Broadcasting, 388 F.2d 272, 279, Fn. 9 (2 Cir. 1967). One phase or another of the litigations has been before Judges Pollack, Cooper and Metzner of this Court. A little history will suffice to set the stage for the formulation of the issues now before the Court.

GAF is the largest manufacturer and distributor of floor tile in the New York area with approximately 20% of the market. Circle installs finished floors. It purchases approximately 28% of all of the floor tile purchased by major contractors in this area. For some years

GAF has supplied floor tile to Circle, furnishing about 50% of Circle's tile requirements in the New York area. Until July 1968 Circle was a private company owned by Morris and Paul Milstein, his son. In July 1968 Circle was acquired by and became a wholly owned subsidiary of Kinney National Services, Inc. Circle owns 420 shares of preferred stock of GAF acquired several years ago. The Milsteins (including two other children of Morris) own 324,346 preferred shares and 209,300 common shares of GAF which has outstanding thirteen million shares of common stock and more than three million shares of preferred stock.[1]

The plaintiff claims that although concededly during 1970 Circle's purchases from GAF for the New York market actually amounted to as much as $1,-100,000, nevertheless, the purchases by Circle in 1968, 1969 and 1970 have declined 33%, 71% and 35% respectively, from the volume purchased from GAF during the year 1967. The complaint alleges that over the three years GAF was deprived of more than three million dollars of sales and $730,000 of profit.

The plaintiff has submitted an affidavit concerning a meeting in February 1969 between two of its sales representatives and Paul Milstein (chief executive officer of Circle) in which Milstein was apprised of an intent by GAF to raise prices on certain tile; that Milstein rejoined that every other manufacturer of vinyl asbestos tile was offering a lower price on vinyl asbestos and about the same price for asphalt tile; that Milstein stated he believed that anyone with about 400,000 shares of GAF stock deserved representation on the board of directors; that he wanted Dr. Werner, Chairman of the Board of GAF to meet

him; that if the stock dropped the Milsteins would buy more; that he did not like what GAF had done to the Milsteins and others; and that the relationship between the Milsteins and GAF had to be straightened out if Circle was to continue to buy GAF floor tiles. He also said that if the relationship between GAF and the Milsteins was not settled it could affect GAF's sales volume outside of the Eastern sales region inasmuch as he had some ideas about all the flooring contractors whom he personally knew in other parts of the United States. He also stated that he intended to exercise full control over Circle's business, apparently despite its ownership by Kinney.[2]

## HISTORY OF THE LITIGATIONS

At first GAF brought an action to enjoin the Milsteins,[3] who allegedly controlled Circle, from purchasing stock and conducting a proxy contest against GAF management upon the ground that the defendants had violated Section 13(d) of the 1934 Act, as amended (15 U.S.C. Sec. 78m) for having failed to file the statement of ownership required and for other 1934 Act violations. Circle was not made a party defendant. Judge Pollack in a well reasoned opinion held that no claim for relief had been stated. The cause of action based on purported violation of the proxy rules and other provisions of the 1934 Act thus died aborning. But GAF, in the meantime, had started this action against the same defendants and Circle as well, charging violations of the antitrust laws from before 1968. GAF seeks: (1) a preliminary and permanent injunction against all the defendants from soliciting or voting proxies at any GAF meeting and from acquiring stock in GAF; (2) divestiture by defendants of their holdings

1. All the preferred shares of GAF were acquired by the Milsteins upon the merger of the Ruberoid Co. into GAF on May 26, 1967. The common shares were acquired since the merger and constitute 1.6% of the common outstanding. The total voting power of the Milsteins approximates 4%.

2. For purposes of the motion these affirmations are deemed to be true.

3. Of the four Milsteins named as defendants, two (Morris and Paul) are officers of Circle and two are unrelated to that corporation or its business.

in GAF; (3) award of damages in the amount of $730,000 plus damages sustained in defending the proxy contest, all trebled to aggregate in excess of $2,190,000.

The posture of the case is unusual. The moving defendant Circle apparently jumped the gun on its co-defendants, the Milsteins, and moved to dismiss the present antitrust complaint before Judge Cooper. Judge Cooper decided that there were triable issues of fact and denied the motion.[4] The individual co-defendants, the Milsteins, on the other hand, waited to move against the antitrust complaint until after the annual meeting had taken place. They then moved for summary judgment (although the corporate defendant did not) before Judge Metzner who granted the motion. Immediately after Judge Metzner's decision the corporate defendant, Circle, now moves for the same relief. The plaintiff contends that the corporate defendant has already lost before Judge Cooper and should not have a second chance. The corporate defendant, on the other hand, claims that if the individual defendants, the alleged prime movers in the alleged conspiracy, have had the action dismissed as to them there is no reason why the corporate defendant alone should stand trial. They also contend that Judge Cooper's decision denying summary judgment to the corporate defendant is not binding because the fact situation has changed. As Circle puts it: "Judge Metzner relied on events taking place after April 1, 1971 (the annual meeting of- GAF)." Neither side has adequately briefed the substantive issues on the theory, apparently, that the matter would not be decided *de novo*.

An analysis of the several opinions of this Court and of the gravamen of the antitrust complaint is required to determine the instant motion.

■ The rules relating to denial of summary judgment in the context of

"law of the case" are not obscure. Although the Court of Appeals for this Circuit once held that, in the interests of orderly procedure, a second District Judge was *required* to follow a first District Judge who had refused to dismiss a complaint (Commercial Union of America v. Anglo-South American Bank, 10 F.2d 937 (2 Cir. 1925)), that Court has since overruled the doctrine. Dictograph Products Co. v. Sonotone Corp., 230 F.2d 131, 134–136 (2 Cir. 1956) per Learned Hand, J., cert. den. 352 U.S. 883, 77 S.Ct. 104, 1 L.Ed.2d 82 (1956). There Judge Hand suggested that there were only two reasons advanced as to why the second Judge may not rule contrary to the earlier ruling: (1) mutual respect and (2) avoidance of shopping by the defeated party. As to the first reason, Judge Hand said that "judicial sensibilities should play no part in the disposition of suitor's rights" (at 135). As to the second reason, while it has much to recommend it, it will not "under all circumstances * * * make[s] the first ruling immune from reconsideration." See also Uniformed Sanitation Men Assoc. v. Commr. of Sanitation, 426 F.2d 619, 628 (2 Cir. 1970), cert. den. 403 U.S. 917, 91 S.Ct. 2223, 29 L.Ed.2d 693 (1971); LeRoy v. Sabena Belgian World Airlines, 344 F.2d 266, 274 (2 Cir. 1965), cert. den. 382 U.S. 878, 86 S.Ct. 161, 15 L.Ed.2d 119 (1965).

■ In any event, denial of a motion to dismiss is not a "final order" even in the District Court. See Commerce Oil Refining Corp. v. Miner, 303 F.2d 125 (1 Cir. 1962). The doctrine of "law of the case" which "merely expresses the practice of courts * * * not a limit to their power" (Holmes, J. in Messinger v. Anderson, 225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed. 1152 (1912)) is not applicable in the absence of a final order. United States v. United States Smelting Co., 339 U.S. 186, 198–199, 70 S.Ct. 537, 94 L.Ed. 750 (1900). Neither the refusal to grant summary judgment

---

4. His decision was made before the annual meeting of GAF at which the election of directors went in favor of management and against the Milsteins.

by Judge Cooper nor the granting of summary judgment by Judge Metzner deprives me of power to come to my own conclusion; indeed, the Court of Appeals for this Circuit recommends that course of action to District Judges.

## INJUNCTIVE RELIEF

■ The granting of injunctive relief in the circumstances of this case where the defendant lacks the present capability of putting the alleged plan into effect and where it is mere conjecture whether the defendant will purchase more stock is precluded by the recent decision of our Court of Appeals. General Fireproofing Co. v. Wyman, 444 F.2d 391, decided June 18, 1971 (2 Cir.). As to divestiture, to order Circle to divest its 420 shares of GAF preferred stock would be a useless act. I am concerned, therefore, only with the claim for damages.

## SHERMAN ACT, SECTION 1

The role of Circle, the corporate defendant, on the allegations of the complaint, was a passive one. It bought little stock in GAF. The individual defendants are alleged to have embarked on a course of conduct violative of the antitrust laws by "causing" Circle not to buy tile from GAF. The pleading speaks in terms of passivity on the part of Circle.

The essence of the antitrust charges, as formulated by the plaintiff, is that Circle's floor tile purchases from GAF were caused by Paul and Morris Milstein to decline substantially during 1968, 1969 and 1970; that defendants Paul and Morris Milstein so acted not in furtherance of any lawful interest but in furtherance of a conspiracy to acquire control of GAF by inflicting economic injury and embarrassing its management; by depressing the market price of GAF shares to make easier acquisition of such shares and hence their voting power; by seeking a senior management and board position for Seymour Milstein; by forming a stockholders protective committee to replace the board and acquire control of GAF. For purposes of summary judgment I take these allegations as true.

■ A *statutory* conspiracy laid under Section 1 of the Sherman Act requires the participation of at least two "independent business entities." See Six Twenty-Nine Productions, Inc. v. Rollins Telecasting, Inc., 365 F.2d 478, 484 (5 Cir. 1966). That is the very nature of the conspiracy charge in the context of the Sherman Act—a concert of action between persons in trade. In the instant case the only joint action claimed as a conspiracy is between Circle and the relatives of its officers who were not in the floor tile business at all and who were not trade competitors of Circle.[5] The relatives, regardless of what other business they were engaged in, could not have had a potential impact on the floor tile market. There was no group boycott "or concerted refusal by traders" against the plaintiff's goods. See e. g. Klor's Inc. v. Broadway-Hale Stores, 359 U.S. 207, 212, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). Nor is there joint action of any kind alleged except the purchase of stock in which Circle was not a participant. No authority has been cited for the proposition that joint action in the preliminary steps of seeking corporate control for the purpose of subsequent restraint of trade makes out a Sherman Act conspiracy.

The only act charged to Circle itself is a refusal to deal with GAF in a volume which plaintiff claims should have been historically compelled on the basis of figures for prior years. The plaintiff fails, however, to allege any facts show-

---

5. No reliance is placed upon joint action between Paul and Morris Milstein, officers of Circle, with their own corporation since a corporate officer may not be a co-conspirator with his own corporation in restraint of trade. See Zelinger v. Uvalde Rock Co., 316 F.2d 47, 52 (10 Cir. 1963); Nelson Radio & Supply Co. v. Motorola, 200 F.2d 911, 914 (5 Cir. 1952); but cf. United States v. New York Great A. & P. Tea Co., 173 F.2d 79, 88 (7 Cir. 1949).

ing that the conditions of the market were similar. No other specific conduct on the part of *Circle* in furtherance of the alleged conspiracy is specified.

In substance, therefore, the only act with which Circle is charged as an actor is (1) a refusal to buy from the plaintiff supplier based on an unlawful motive to hurt the business of plaintiff which, in turn, (2) could cause the price of its stock to fall which, in turn, (3) could enable the defendant's co-conspirators, the Milsteins, to buy more shares, which, in turn, (4) could enable the Milsteins to obtain control of the plaintiff, which, in turn, (5) could result in either a merger or joint action (vertical integration) by plaintiff under domination of the Milsteins, which, in turn, (6) could create a restraint of trade or monopoly in goods flowing into the New York market in interstate commerce to the detriment not so much of GAF as of Circle's flooring competitors who might be disadvantaged by Circle's putative power to buy at lower prices. Thus could an unreasonable restraint of trade be effected.

The fallacy is that such a conspiracy, if it ever existed, was aborted. A refusal to deal becomes illegal under the Sherman Act only when it produces an unreasonable restraint of trade. Ace Beer Distributors Inc. v. Kohn Inc., 318 F.2d 283, 286 (6 Cir. 1963). Circle had the right to refuse to deal with GAF in the first instance. United States v. Colgate Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919); F. T. C. v. Raymond Bros.-Clark Co., 263 U.S. 565, 573, 44 S.Ct 162, 68 L.Ed. 448 (1924); Eastern States Retail Lumber Assn. v. United States, 234 U.S. 600, 614, 34 S.Ct. 951, 58 L.Ed. 1490 (1914). Despite limitations of the *Colgate* doctrine in recent years, it is still true that a mere refusal to deal, *without more*, is not a Sherman Act violation. House of Materials, Inc. v. Simplicity Pattern Co., 298 F.2d 867 (2 Cir. 1962). Even if Circle's motive

was to hurt GAF because it refused to give a directorship to Milstein, that would not be a Sherman Act violation. House of Materials, Inc. v. Simplicity Pattern Co., *supra*; Dart Drug Corp. v. Parke, Davis & Co., 120 U.S.App.D.C. 79, 344 F.2d 173, 186 (1965).

If the lessening of purchases by Circle from the volume of previous years has hurt the plaintiff, it is a hurt which, if based on price competition, is non-compensable; and, if tortious, is compensable, if at all, in another forum and under some different theory. The steps actually taken toward the consummation of a technical Sherman Act Section 1 violation by a vertical integration were too remote from achievement to be actionable as an attempted restraint of trade.[6]

The claim that the expense of defending a proxy contest to preserve the status of management is an element of damage in an antitrust action where the challenged acts might, it is urged, create a possible monopoly in the future is, moreover, untenable. The whole business of proxy contest expense is in the process of being rationalized in the courts largely on a case-to-case basis. But neither existing policy nor, indeed, the recognition that this type of antitrust suit can be a weapon for management rather for the corporation itself, permits the inclusion of any such element of damages in this case.

SHERMAN ACT, SECTION 2

While it is true that to establish a violation of Section 2 of the Sherman Act it is not necessary to show that success has rewarded appellant's attempt to monopolize (Lorain Journal v. United States, 342 U.S. 143, 153, 72 S.Ct. 181, 96 L.Ed. 162 (1951)), it is also true that what the section is aimed at is the "dangerous probability" that monopolization will succeed, Swift & Co. v. United States, 196 U.S. 375, 396, 25 S. Ct. 276, 49 L.Ed. 518 (1905), or at the actual *use* of monopoly power to fore-

6. Vertical integration, without more, is not a violation. United States v. Columbia

Steel Co., 334 U.S. 495, 525, 68 S.Ct. 1107, 92 L.Ed. 1533 (1949).

close competition. United States v. Griffith, 334 U.S. 100, 106–107, 68 S.Ct. 941, 92 L.Ed. 1236 (1948).[7] Where monopolization has not yet been effected, as here, specific intent to build monopoly is essential to guilt. Times-Picayune Pub. Co. v. United States, 345 U.S. 594, 626, 73 S.Ct. 872, 97 L.Ed. 1277 (1953). I believe that the passive role ascribed to Circle negates such an independent specific intent on its own part. In view of the remoteness of the single activity on the part of Circle of which complaint is made there is no legal ground for believing that the plaintiff will be able to prove a dangerous possibility that the attempt to monopolize will succeed; and surely, there was never any actual use of monopoly power by the defendant.[8]

### CLAYTON ACT, SECTION 7

 The claim under Section 7 of the Clayton Act is also without merit. Although Judge Metzner's dismissal as to the individuals did not purport to consider whether Circle, the corporate defendant, could be liable under Section 7, he did note that a corporation, for Section 7 purposes, may be found to be in violation where the stockholders made the purchases on behalf of the corporation (F. T. C. v. Swift & Co., 5 F.T.C. 143 (1924), affd. 8 F.2d 595 (7 Cir. 1925), affd. 272 U.S. 554, 47 S.Ct. 175, 71 L.Ed. 405 (1926)). He left open whether Circle itself had violated Section 7, even though the individuals were found incapable of committing such violation.

The plaintiff has alleged no specific facts to lead to the conclusion that the purchases by the Milsteins were on behalf of Circle or paid for by Circle which is now wholly owned by Kinney.

In the case at bar, moreover, even if the acquisition of GAF stock by the Milsteins could be deemed an acquisition by Circle, such an acquisition could not be in violation of Section 7 of the Clayton Act at this time. The acquisition is, as matter of law, too remote from restraint of trade or monopolization. The Clayton Act was not intended to reach "every remote lessening of competition". Standard Fashion Co. v. Magrane-Houston Co., 258 U.S. 346, 357, 42 S.Ct. 360, 66 L.Ed. 653 (1922). A corporation is prohibited from acquiring the stock or assets of another corporation where "the effect of such acquisition may be substantially to lessen competition" (15 U.S.C. Section 18). But the test, where the acquisition has already occurred, is whether in the relevant market "a lessening of competition *has* probably occurred" and "the proper test is one of the *qualitative* substantiality of the resulting effect on competition in the relevant market." See American Crystal Sugar Co. v. Cuban-American Sugar Co., 259 F.2d 524, 527 (2 Cir. 1958; emphasis original). In the instant case the "resulting effect on competition in the relevant market" was nil, since the Milsteins failed to obtain a voice in the affairs of the plaintiff.

Although it is not easy to grant summary judgment in an antitrust case (see Poller v. Columbia Broadcasting Co., 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); Fortner Enterprises v. United States Steel, 394 U.S. 495, 500, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969)), and especially where full discovery has not been had, I am convinced that in this case no development of facts can result in a judgment for the plaintiffs. (See Beckman v. Walter Kidde & Co.,

---

7. GAF itself supplies only 20% of floor tile sold in the New York market if that is the relevant market. If Circle had obtained control of GAF, the competitors of Circle in the New York market might have refused to deal with GAF and given their business to competitors of GAF who sell 80% of the floor tile, thus increasing competition in the market rather than decreasing it. This possibility emphasizes the remoteness of acts thus far taken by Circle toward "monopolization."

8. Barber, "Refusals to deal under the Federal Anti-Trust Laws," 103 U. of Pa. L.Rev. 847, 872 (1955): "The cases where violations of Section 2 have been found each involved what might be characterized as predatory refusals to deal successfully aimed at directly eliminating competition with the seller."

316 F.Supp. 1321, 1324, 1328 (E.D.N.Y. 1970).) The result is fortified by my feeling (although I would not have so ruled for that reason alone) that these actions stemming from the proxy contest are a form of gamesmanship from which the processes of a busy Court should not suffer.[9]

The Court strongly suggests that, in future, codefendants who are not in antagonistic positions coordinate their motions before a single Judge to avoid such unfortunate multiplicity as has been the case here.

The motion for summary judgment in favor of defendant Circle Floor Co., Inc. is granted.

So ordered.

---

9. Cf. Mr. Justice Harlan dissenting:
 " * * * (T)he rule (56(c)) does not indicate that it is to be used any more 'sparingly' in antitrust litigation * * than in other kinds of litigation, or that its employment in antitrust cases is subject to more stringent criteria than in others. On the contrary, without reflecting in any way on the good faith of this particular lawsuit, having regard for the special temptations that the statutory private antitrust remedy affords for the institution of vexatious litigation, and the inordinate amount of time that such cases sometimes demand of the trial courts, there is good reason for giving the summary judgment rule its full legitimate sweep in this field." Poller v. Columbia Broadcasting Co., *supra* at 478, 82 S.Ct. at 493.
 In general accord, see First National Bank of Ariz. v. Cities Service Co., 391 U.S. 253, 289–290, 88 S.Ct. 1575, 20 L.Ed. 2d 569 (1968).