**Saltau J. QUIGLEY and Richard B. Uber, Plaintiffs,**

v.

**EXXON COMPANY U. S. A., a subsidiary of Exxon Corporation, a corporation, et al., Defendants.**

**Civ. No. 74–178.**

United States District Court,
M. D. Pennsylvania.

May 10, 1974.

Samuel L. Andes, Lemoyne, Pa., for plaintiffs.

James H. Stewart, Jr., Robert C. Spitzer, Nauman, Smith, Shissler & Hall, Harrisburg, Pa., for defendants.

SHERIDAN, Chief Judge.

Plaintiffs, Saltau J. Quigley and Richard B. Uber, who are independent Exxon service station dealers, brought this action under the Sherman Anti-Trust Act, 15 U.S.C.A. § 1 et seq., requesting preliminary and permanent injunctive relief against the defendants. Specifically, plaintiffs seek to restrain Exxon from opening a new company-operated car wash gasoline station with a base year volume of 853,000 gallons of motor fuel, which, if not enjoined, plaintiffs contend will enable Exxon to re-

strain trade in the Lemoyne-New Cumberland-Lower Allen-Highland Park area in Cumberland County in violation of Section 1 of the Sherman Act,[1] 15 U.S.C.A. § 1, thereby causing irreparable harm to plaintiffs. Therefore, plaintiffs request that Exxon be permitted to open the new car wash only with a supply of gasoline that is no greater than that allocated to them, and that Exxon be ordered "to fairly and equitably allocate and distribute" its fuel among all retail outlets treating independent and company-operated stations alike. Finally, the complaint alleges that the gasoline sales agreements between Exxon and each of the plaintiffs, which set a minimum volume of fuel which plaintiffs must purchase and a maximum quantity which Exxon is obligated to supply, constitute a restraint of trade in violation of Section 1 and therefore are void.

In accordance with Rule 65(a)(2) of the Federal Rules of Civil Procedure, the case was set down for non-jury trial on the merits, thereby consolidating the trial with the hearing on the preliminary injunction.

## I. FINDINGS OF FACT

1. Plaintiff Saltau J. Quigley is an independent dealer who operates an Exxon service station at Fifth and Market Streets in Lemoyne, Cumberland County, Pennsylvania.

2. Plaintiff Richard Uber is an independent dealer who operates an Exxon service station at the intersection of Lowther Road and Carlisle Road in Lower Allen Township, Cumberland County, Pennsylvania.

3. Defendant Exxon Corporation has entered into gasoline sales agreements with each of the plaintiffs which provide that plaintiffs will purchase a minimum gallonage of 50 percent of their 1973 sales and that defendant will supply a maximum gallonage of 105 percent of their 1973 sales. These contracts set the minimum and maximum amounts of gasoline which defendant will sell to plaintiffs from February 15, 1974, to July 1, 1975. Clause 16 of the agreements permits the plaintiffs to terminate the contract at any time upon sixty days written notice to Exxon. Exxon has executed similar sales agreements with its other retail dealers. In 1974, Exxon has not had available any quantity of gasoline in excess of the 105 percent reserve amount.

4. The maximum gallonage set in the sales agreements presently does not restrict or affect in any manner the amount of gasoline supplied to the plaintiffs since their allocation of fuel is regulated by the federal government's mandatory allocation program and hence is determined in accordance with the Emergency Petroleum Allocation Act of 1973, Pub.L. No. 93–159, 87 Stat. 627, and the Federal Energy Office (FEO) regulations promulgated thereunder.

5. Pursuant to FEO regulations, Exxon supplies plaintiffs with a quantity of gasoline equal to their base period volume—i. e., their 1972 gasoline sales—multiplied by a monthly allocation fraction determined by dividing the total quantity of gasoline Exxon has available in any particular month by the total base volume of all those it is obligated to supply.

6. In accordance with FEO regulations, plaintiff Quigley has a base year volume for allocation purposes of 272,000 gallons—the amount of gasoline he sold in 1972—or an average base monthly volume of 22,700 gallons, with a yearly increase of 2.8 percent or 7,600 gallons for his 12.8 percent increase in 1973 sales over 1972, so that his average base monthly volume is 23,300 gallons.[2] See FEO Reg. §§ 211.1, 211.11, 211.12,

---

1. Section 1 of the Sherman Act, 15 U.S.C.A. § 1, in part provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. . . ."

2. All the figures in this memorandum are approximate, but definitive.

211.13, 39 Fed.Reg.No. 10, pt. III (January 15, 1974).

7. In accordance with the above FEO regulations, supra, plaintiff Uber has a base year volume for allocation purposes of 278,000 gallons—the amount of gasoline he sold in 1972—or an average base monthly volume of 23,200 gallons.

8. Plaintiffs admit and the court finds that they are receiving all the gasoline they are permitted to receive under the FEO regulations. Having supplied the plaintiffs with all the fuel they are entitled to under the government's mandatory allocation program, Exxon cannot legally supply them with additional quantities of gasoline.

9. Defendant Exxon Corporation operates an unincorporated marketing division known as Exxon Company U.S.A.; defendant James K. Muldrow is the division manager of the Harrisburg district, comprising 39 counties in central and northeastern Pennsylvania.

10. In the spring of 1971, defendant Exxon, through its marketing investment program, analyzed the Harrisburg market to determine the best locations for service stations in that area. On the basis of demographic data, projected traffic counts, median income of the area, density of registered vehicles, existing competition in the vicinity, and other data, Exxon determined that the site at the southeast corner of Third and Lowther Streets in Lemoyne was a "preferred representation" location.

11. In 1971, this site was occupied by a BP (British Petroleum) service station. In 1968, the last year of operation of the BP station, it sold 187,000 gallons of gasoline. The BP lease on the location expired December 31, 1971.

12. Defendant Exxon began negotiating for the location in September 1971, and negotiations continued through 1972, during which period other persons were actively engaged in negotiating for a lease on the site. In December 1972, the landlord, William Rittner, decided to negotiate exclusively with defendant Exxon for a lease of the location.

13. In February 1973, the terms of the lease agreement were substantially negotiated to permit Exxon to operate a car wash gasoline station at this location for a period of fifteen years, with three five-year renewal periods, with an initial monthly rental for the first five years of $1,683 per month and a total rental obligation for the first fifteen-year period of $334,310.

14. The lease was executed by defendant Exxon on June 6, 1973. The lease required an investment by the landlord of $88,000 for the erection of the buildings and preparation of the site and an investment by Exxon of $109,000 for the installation of tanks, pumps, and car wash equipment.

15. The "Unnamed Manager of Exxon Service. Station in Lemoyne," named as a defendant in the complaint, who will manage this new car wash station, is Louis Bensinger. He has been on Exxon's payroll since February 1974.

16. Defendant Exxon has filed an application with the FEO for approval of a base year volume for allocation purposes of 853,000 gallons and hence an average base monthly volume of 71,100 gallons for the new car wash station. The Federal Energy Office has not yet acted upon this application.

17. The above proposed base year gallonage for the new station was determined by Exxon in the following manner:

(a) The number of car wash customers was calculated—after taking into account the "screening factors" or hurdle criteria of car registration and median family income within a mile and a half radius of the new station and the number of competing car washes in the immediate market area—on the basis of projected traffic counts on the roads the new station fronts. The estimated average daily traffic count for 1971 was 29,700 and is projected at 33,800 for 1974. The estimated daily traffic count for 1973 was 33,000. Using the 33,000 figure, Exxon estimated 7900 car washes per month at the new station.

(b) From its marketing studies and based on its experience with car wash stations, Exxon determined that 10 gallons was the appropriate average gallonage per car wash.

(c) 7900 car washes per month at 10 gallons of gasoline per car wash results in an estimated gallonage of 79,000 gallons per month or 948,000 gallons for 1973. This is the volume of gasoline Exxon estimates the car wash would have sold if it had been operating in 1973.

(d) To determine the 1972 base year volume, Exxon discounted by 10 percent the 948,000 gallons and thus determined that the base year volume for the new station was 853,800 gallons (90 percent of 948,000), which results in an average base monthly volume of 71,100 gallons.[3]

18. The above method used by Exxon to estimate the gasoline sales volume for the new car wash is reliable. The actual motor fuel sales for Exxon's car washes in the eastern region of the United States have been on the average *116.9 percent of the estimates* determined by the same method utilized by Exxon in determining the new car wash's estimated sales volume.[4]

3. The 71,100 gallons constitutes Exxon's average base monthly volume. This is not the actual amount of gasoline which the new car wash would receive in any given month. That amount is determined, as with all other retail outlets, pursuant to FEO regulations which require that the station's base monthly volume—71,100 gallons—be multiplied by the supplier's (Exxon's) allocation factor for that month.

Thus, for example, in February 1974, when Exxon had an allocation factor of 78 percent, the new car wash, if it had been operating at that time, would have received 78 percent of 71,100 gallons of gasoline. Ac-

tually, this is only an approximation of what the station would have received since the 71,100 gallons is an *average* monthly base volume: under FEO regulations the base volume can be seasonalized so that the base is somewhat higher in months when consumer demand is high and somewhat lower in months when consumer demand is less. Thus, the proposed base volume for the new car wash for February 1974 was a seasonalized volume of 61,686 gallons, and the new station actually would have received 78 percent (Exxon's February allocation factor) of 61,686 gallons if it had been operating in February of this year.

4. The following chart compares the gasoline sales volumes estimated by Exxon for the other car washes it has opened in the eastern region, estimates which were determined in the same manner the estimate for the new car wash was determined, with the actual sales volumes at the stations after they opened.

EASTERN REGION
EXTERIOR CAR WASHES
MOTOR FUEL SALES
ACTUAL VS ESTIMATE
DECEMBER 31, 1973

| City & State | Date On Stream | Actual Motor Fuel Volume M Gals. | Estimated Motor Fuel Volume M Gals. | Actual Vs Estimate % |
|---|---|---|---|---|
| Columbia, Md. | 11/71 | 2,490 | 1,440 | 172.9 |
| Dayton, Ohio | 07/73 | 303 | 377 | 80.4 |
| Columbus, Ohio | 11/72 | 687 | 600 | 114.5 |
| Cincinnati, Ohio | 09/73 | 158 | 199 | 79.4 |
| Lancaster, Pa. | 05/73 | 511 | 540 | 94.6 |
| Wilkes-Barre, Pa. | 11/73 | NO HISTORY AVAILABLE | | |
| York, Pa. | 09/72 | 303 | 756 | 40.1 |
| Newport, Del. | 02/73 | 813 | 620 | 131.1 |
| Richmond, Va. | 08/70 | 1,890 | 1,512 | 125.0 |
| Norfolk, Va. | 04/72 | 1,584 | 1,620 | 97.8 |
| Newport News, Va. | 01/73 | 716 | 541 | 132.3 |
| Arlington, Va. | 02/73 | 725 | 500 | 145.0 |
| TOTAL REGION | | 10,180 | 8,705 | 116.9% |

19. The 1972 base year volume of 853,000 gallons with an average base monthly volume of 71,100 gallons is a reasonable base year determination for the new car wash. The amount is not excessive from a marketing standpoint —i e., it is reasonably related to projected consumer demand.

20. The volume of gasoline sold in 1968, its last year of operation, by the BP service station on the site where the new car wash is located does not provide a more reliable basis for estimating the new car wash's sales volume.

21. The method of determining gallonage estimates for various types of motor fuel sales operations is applied without discrimination by Exxon to company-operated stations and independent dealers.

22. The methods and techniques utilized in estimating the new car wash's gallonage were developed for the purpose of guiding investment prior to the critical gasoline shortage.

23. Plaintiff Quigley operates a service station in the Borough of Lemoyne at a location across Interstate Route 83, 7/10 of a mile from Exxon's new car wash. The normal traffic flow passing Quigley's station does not pass the new car wash. Quigley's business is oriented toward tire sales; tires will not be sold at the new car wash station.

24. Plaintiff Uber operates a service station in Highland Park at the intersection of Carlisle Road and Lowther Road, one mile from the new car wash. Uber's station largely serves Highland Park, a residential area. Most of the traffic passing Uber's station does not pass the new car wash.[5] Uber's business is oriented toward service which will not be available at the new car wash station.

25. Exxon's new car wash and plaintiffs' service stations serve different traffic flows and different marketing areas; the new car wash will not directly compete with plaintiffs' stations.

26. To avoid being open at times when they have no gasoline to sell and to avoid depleting their supplies of gasoline too long before they are re-supplied, plaintiffs have had to shorten the hours per day and week they are open—Quigley has reduced from 90 hours to 50 hours and Uber has reduced from 98 hours to 60 hours; have had to curtail the days per week they are open—Quigley from 7 days to 5 days and Uber from 7 days to 6 days; and have had to limit at times the amount of gasoline they will sell to each customer.

27. Plaintiffs admit they will still be able to sell all the gasoline they presently are entitled to under FEO regulations after the new car wash station opens.

28. The routinized buying behavior of plaintiffs' customers will not be interrupted by the new car wash.[6]

29. Plaintiffs established no damage or loss they would suffer as a result of the opening of the new car wash with its proposed base year volume of 853,000 gallons of gasoline.

30. The effect of the allocation to defendant's new car wash on plaintiffs' monthly allocation is de minimis.

31. Exxon has acted alone with respect to the establishment, operation and supply of the new car wash station.

32. Plaintiff Quigley in violation of FEO price regulations has been overcharging for gasoline, despite having been counseled as to the maximum prices allowed. For example, in March 1974, Quigley charged 55.9 cents per gallon for Exxon regular when the maxi-

---

5. Those vehicles heading toward Harrisburg which continue on Lowther Street with the intent of entering Interstate 83 on the eastern most ramp would pass the new car wash. This, however, is not the general traffic flow to Harrisburg.

6. The gasoline shortage itself interrupted to a certain extent the routinized buying behavior of all consumers.

mum legal price under FEO regulations was 47.4 cents per gallon.

33. Plaintiff Uber in violation of FEO price regulations has been overcharging for gasoline, despite having been counseled as to the maximum prices allowed. For example, in March 1974, Uber charged 53.9 cents per gallon· for Exxon regular when the maximum legal price under FEO regulations was 47.4 cents per gallon.

34. The opening of the new car wash with the proposed base year volume of 853,000 gallons of gasoline will not restrain trade in the Lemoyne-New Cumberland-Lower Allen-Highland Park area or in any other market. The new car wash station will increase competition in the relevant market in which it competes.

## II. COMBINATION IN RESTRAINT OF TRADE

■ Section 1 of the Sherman Act reaches only those undue restraints of interstate trade or commerce which flow from a contract, a combination, or a conspiracy. The technical differentiation of contract, combination, and conspiracy[7] is not important in the application of Section 1. What is important is the existence of two factors which are common to and connoted by the concepts of contract, combination, and conspiracy and thus are essential elements of any Section 1 claim: (1) a plurality of actors, that is, two or more persons; and (2) concerted action.

In the instant case, defendant Exxon Corporation, operating through its unincorporated marketing division, Exxon Company U.S.A., analyzed the Harris-burg market to determine the best location for service stations in the area and decided in early 1971 that the site at the southeast corner of Third and Lowther Streets in the Borough of Lemoyne was a "preferred representation" location. This determination was made on the basis of marketing analyses by Exxon of demographic data, projected traffic counts, median income of the area, and other relevant factors. Exxon then estimated the gasoline volume for the new car wash station for its first year of operation utilizing marketing criteria and methods it has developed and applied in the past in establishing· volumes for new dealers and new company-operated stations having no sales volume history. Exxon calculated a base volume for the new car wash pursuant to its interpretation of the FEO regulations. Exxon will be the sole gasoline supplier of the new car wash which will be company-operated. It will be managed by Louis Bensinger, a salaried employee of Exxon.

■ "Common ownership and control does not liberate corporations from the impact of the antitrust laws," Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 1951, 340 U.S. 211, 215, 71 S.Ct. 259, 261, 95 L.Ed. 219, and therefore subsidiary or affiliate corporations are capable of combining with their parent corporation for the purposes of Section 1 of the Sherman Act. *See*, e. g., Timken Roller Bearing Co. v. United States, 1951, 341 U.S. 593, 598, 71 S.Ct. 971, 95 L.Ed. 1199; United States v. Yellow Cab Co., 1947, 332 U.S. 218, 227, 67 S.Ct. 1560, 91 L.Ed. 2010. However, the intracorporate conspiracy doctrine

---

7. A contract refers to a binding agreement, *see* United States v. American Linen Supply Co., N.D.Ill.1956, 141 F.Supp. 105. A combination involves a union or association of two or more persons for the attainment of some common end, *see* United States v. Parke, Davis & Co., 1960, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505. A conspiracy, which has been variously defined, must involve a plurality of actors who either act unlawfully or seek to achieve an unlawful goal, *see* United States v. General Motors Corp., 1966, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415; American Tobacco Co. v. United States, 1945, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575; United States v. Logan Co., W.D.Pa.1957, 147 F.Supp. 330. The courts in the Sherman Act context have used the terms interchangeably, *see*, e. g., Perma Life Mufflers, Inc. v. International Parts Corp., 1968, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed. 2d 982.

has been limited by the courts, and it is settled that a corporation cannot conspire or combine with its officers or agents to violate the antitrust laws, Nelson Radio & Supply Co., Inc. v. Motorola, Inc., 5 Cir. 1952, 200 F.2d 911, cert. denied, 1953, 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356; Chapman v. Rudd Paint & Varnish Co., 9 Cir. 1969, 409 F.2d 635, 643 n. 9. Likewise, a corporation cannot conspire with its *unincorporated* divisions. Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke and Liquors, Ltd., 9 Cir. 1969, 416 F.2d 71, 82–84; Deterget Corp. v. United Aircraft Corp., D. Del.1962, 211 F.Supp. 348. The basis of the rule that a corporation cannot conspire or combine with its officers, agents, employees, or unincorporated divisions is that there must be at least two persons or entities to constitute a conspiracy or combination, and a corporation cannot conspire or combine with itself any more than a person can. Cliff Food Stores, Inc. v. Kroger, Inc., 5 Cir. 1969, 417 F.2d 203, 206. Therefore, since defendant Exxon acted alone with respect to all decisions concerning the establishment of the new station and its allocation of gasoline, a volume which Exxon will solely supply, an essential element of a Section 1 action—participation of a plurality of actors in concerted action—is totally absent.

Plaintiffs contend, however, that Exxon has combined with plaintiffs and all other retail outlets, both dealer and company-operated, and that this combination is sufficient for purposes of Section 1. In support of their contention, plaintiffs cite Albrecht v. Herald Co., 1968, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 and Simpson v. Union Oil Co., 1964, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98, in which the Court held that the combination requirement of Section 1 was satisfied by a plaintiff's unwilling compliance with defendant's resale price suggestions. Plaintiffs also rely on Perma Life Mufflers, Inc. v. International Parts Corp., 1968, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982, in which the Court held that unwilling compliance by plaintiffs with a restrictive sales agreement entered into with defendant, which barred plaintiffs from purchasing from other competing suppliers, prevented them from selling outside a designated territory, tied the sale of mufflers to the sale of other of defendant's products, and required them to sell at fixed retail prices, constituted a combination within the meaning of Section 1. This theory of combination is not applicable to the facts of this case. Plaintiffs had no participation or involvement whatever in Exxon's actions with respect to the establishment and supply of its new car wash station. In *Albrecht, Simpson,* and *Perma Life Mufflers,* the plaintiffs were unwilling *participants* in the alleged illegal activity; the plaintiffs acted jointly with the defendants and thus were an integral part of the illegal scheme. In the instant case, plaintiffs can in no sense be viewed as having participated in Exxon's plans to establish, operate, and supply a new car wash station. Plaintiffs assert that they have unwillingly acquiesced to Exxon's decision to supply a large amount of gasoline to the new station and that this constitutes participation from which joint action and a combination arises. This contention is without merit since the new station's gasoline supply was determined solely by Exxon and ultimately is subject to FEO approval. The plaintiffs were not involved in any way in the allocation decision; their acquiescence was not needed, sought, nor given. In no real sense have the plaintiffs been participants with Exxon in any concerted action with respect to the new station. Thus, the facts of the instant case do not fall within any recognized or logical theory of combination.

## III. REFUSAL TO DEAL

As required by FEO regulations, Exxon allocates the gasoline it has available for any given month to its retail outlets, both dealer and company-operated, by multiplying each station's base period volume (i. e., its 1972 gasoline sales volume) by a monthly allocation percent-

age, which is calculated by dividing Exxon's total available supply of gasoline for that month by the total base period volume of all those Exxon is obligated to supply. Plaintiffs admit that they are receiving all the gasoline which they are permitted to receive under the FEO regulations. However, they contend that the opening of the new station, with its new allocation of gasoline, will increase the total base period volume of Exxon's customers thereby slightly reducing Exxon's monthly allocation percentage. This would result in a very small reduction in the amount of gasoline which all Exxon-supplied stations, including plaintiffs, would receive. However, it is clear that the effect of the allocation to the new car wash on plaintiffs' monthly allocation is de minimis. Plaintiffs claim, however, that Exxon will supply this new company-operated station with a large amount of gasoline that otherwise would have been allocated equally among the plaintiffs and all other Exxon customers and that this constitutes an illegal refusal to deal.

■ A refusal to deal becomes illegal under the Sherman Act only when it produces an unreasonable restraint of trade. Ace Beer Distributors, Inc. v. Kohn, Inc., 6 Cir. 1963, 318 F.2d 283, cert. denied, 1963, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed. 2d 166. A mere refusal to deal, *without more,* is not a Sherman Act violation. United States v. Colgate & Co., 1919, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992; GAF Corp. v. Circle Floor Co., Inc., S.D. N.Y.1971, 329 F.Supp. 823, aff'd 2 Cir. 1972, 463 F.2d 752. Plaintiffs contend that there is a refusal to deal in furtherance of an unreasonable restraint of trade.

Plaintiffs base their allegation on the following theory. Exxon's refusal to deal with plaintiffs and its other retail outlets has enabled Exxon to supply the new car wash with an unduly large amount of gasoline, far in excess of the fuel supplies available to plaintiffs and all other Exxon outlets in the Lemoyne-New Cumberland-Lower Allen-Highland Park communities, the alleged relevant market for the new car wash. This superior supply of motor fuel will enable the new station to sell virtually unlimited amounts of gasoline to all customers and to stay open much longer hours than plaintiffs. This will result in many of plaintiffs' regular customers patronizing the new station, particularly those with Exxon credit cards.[8] The new station's competitive advantage arising from its superior supply will irreparably damage the plaintiffs in that it will interrupt the routinized buying behavior of plaintiffs' regular customers, thereby destroying the good will developed by Quigley and Uber over a long period of time. In short, Exxon's refusal to deal has enabled it to so supply its new station that it will have an unfair competitive advantage over all other Exxon stations, including plaintiffs', in the market in which it will compete. This is the unreasonable restraint of trade which plaintiffs allege.

■■ The Supreme Court has designated certain classes of combinations as illegal *per se,* and their mere existence constitutes a Section 1 violation without any reference to market effect. Restraints which are deemed unreasonable *per se* are horizontal price fixing, United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129; resale price maintenance, Dr. Miles Medical Co. v. John D. Park & Sons Co., 1911, 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502; division of markets, United States v. Arnold, Schwinn & Co., 1967, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249; United States v. Topco Associates, Inc., 1972, 405 U.S. 596, 92 S.Ct. 1126, 31 L. Ed.2d 515; group boycotts, Klor's, Inc. v. Broadway-Hale Stores, Inc., 1959, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741; United States v. General Motors Corp., 1966, 384 U.S. 127, 86 S.Ct. 1321, 16 L. Ed.2d 415; tying arrangements, Interna-

---

8. Both Quigley and Uber testified that approximately 65 percent of their gasoline sales are credit card sale .

tional Salt Co. v. United States, 1947, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20; Fortner Enterprises, Inc. v. U. S. Steel Corp., 1969, 394 U.S. 495, 89 S.Ct. 1252, 22 L. Ed.2d 495; and reciprocal dealing, United States v. Griffith, 1948, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236. A refusal to deal which is in furtherance of one of these illegal objectives is itself a *per se* violation of the Sherman Act. Interphoto Corp. v. Minolta Corp., S.D.N.Y.1969, 295 F.Supp. 711, aff'd 2 Cir. 1969, 417 F.2d 621. The alleged restraint of trade in the instant case clearly does not fall within any of the unreasonable *per se* categories. Therefore, the alleged restraint of trade must be evaluated with respect to its market impact since only those which unreasonably restrain competition in a particular market are proscribed. United States v. Arnold, Schwinn & Co., 1967, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249.

■ After careful analysis of the evidence adduced at the trial, the court is firmly convinced that the opening of the new station with its proposed supply of gasoline will not constitute a restraint of trade of any kind. Plaintiffs have failed to prove that the opening of the new station will have any adverse effect on their competitive position in the market. Given the completely different flow of traffic past each of the three stations,[9] the court is not convinced that plaintiffs' stations and the new Exxon station are competitors in the same geographical market. Moreover, even assuming that the three stations compete in the same market, the underlying basis for plaintiffs' claim—that the large supply of gasoline allotted to the new car wash will enable the new station to stay open longer hours and make unlimited sales—is not supported by the record. If Exxon's estimate of sales volume for the new car wash is reliable, the new station's allotment of gasoline based on a 1972 estimated sales volume, as required by FEO regulations, is substantially less than the amount the new sta-

tion could sell if given an unlimited supply. Therefore, the new car wash also may have to limit its hours of operation, at least in regard to the sale of gasoline. It is not the quantity of motor fuel itself but the amount supplied in relation to consumer demand at any particular station that determines how long one can stay open without running short of gasoline. In recognition of this fact, FEO regulations do not require that all stations be supplied with the same quantity of gasoline but that all stations be supplied with the same fraction of their 1972 sales volume.

The court finds that Exxon's estimated sales volume for the new station, which was calculated in accordance with marketing criteria and techniques developed and successfully utilized by Exxon in the past, is reasonable and hence the proposed base year gallonage for the new station is not excessive. Past performance by new car wash stations opened by Exxon support the reliability of the methods used in estimating the sales volume for the new station.[10] Plaintiffs clearly have failed to prove that the new car wash will be able to stay open longer than plaintiffs or that it will be able to make unlimited sales at times when plaintiffs cannot.

Moreover, even if the new car wash were to stay open longer hours and sell unlimited amounts of motor fuel, plaintiffs have failed to demonstrate how this would restrain trade. There is no allegation and certainly no evidence that Exxon through its new station is attempting to monopolize the retail sale and distribution of its gasoline in the market in which the new car wash will compete. Indeed, the court has concluded that the opening of the new station is likely to increase competition in the market in which it will compete by making available to consumers an additional supply of motor fuel at a time when there still is a shortage in the market. Plaintiffs are in a poor position to complain about new competition when the

9. See findings of fact 23–25.

10. See footnote 4 and accompanying text.

evidence establishes that the prices they have been charging for gasoline are substantially higher than legally permissible under FEO regulations.[11] In addition, plaintiffs admit that they presently are able to sell all the gasoline they receive under the FEO regulations and that after the new car wash opens they will still be able to sell all the motor fuel they presently receive under the mandatory allocation program.

For all of the foregoing reasons, plaintiffs' contention that "the greater supply of gasoline which the new station will have will restrain trade by enabling the new station to operate without the marketing restrictions under which the plaintiffs and all other gasoline retail dealers in the three communities must operate" is unsupported by the evidence. The court finds that no restraint of trade will emanate from the opening of the new car wash with its proposed gallonage of gasoline. Any refusal to deal herein on the part of Exxon clearly was *not* in furtherance of any restraint of trade; Exxon's conduct falls within the confines of United States v. Colgate & Co., 1919, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992, as limited by United States v. Parke, Davis & Co., 1960, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505, and Albrecht v. Herald Co., 1968, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998. Therefore, there is no Section 1 violation. *Cf.* Rea v. Ford Motor Co., 497 F.2d 577, pp. 587–590 (3 Cir., filed April 26, 1974); Weather Wise Co. v. Aeroquip Corp., 5 Cir. 1972, 468 F.2d 716, cert. denied, 1973, 410 U.S. 990, 93 S.Ct. 1505, 36 L. Ed.2d 188; GAF Corp. v. Circle Floor Co., S.D.N.Y.1971, 329 F.Supp. 823, 828, aff'd 2 Cir. 1972, 463 F.2d 752; Beverage Distributors, Inc. v. Olympia Brewing Co., 9 Cir. 1971, 440 F.2d 21, 32–33; House of Materials, Inc. v. Simplicity Pattern Co., 2 Cir. 1962, 298 F.2d 867. Thus, the request for preliminary and permanent injunctive relief will be denied.

## IV. GASOLINE SALES AGREEMENTS

The sales agreements between Exxon and each of the plaintiffs set a minimum of 50 percent of their 1973 sales volumes as the amount which the plaintiffs agree to purchase and a maximum of 105 percent of their 1973 sales volumes as the amount which Exxon would be obligated to supply. Exxon has similar contracts using identical percentages with all the independent dealers it supplies. The contracts with each of the plaintiffs are for one year, from March 1974, to July 1975, and can be terminated by plaintiffs on sixty days written notice. Plaintiffs object to the 105 percent maximum in the contract. Plaintiffs contend that this system of distribution discriminates against independent dealers and will enable Exxon to open additional company-operated stations which will not be subject to contractual limitations on maximum supply and which will therefore enjoy an unfair competitive advantage. In this manner plaintiffs contend that these sales agreements constitute an unreasonable restraint of trade.

For purposes of Section 1, a contract may be an illegal restraint of trade (1) because it constitutes a *per se* violation, or (2) because an unreasonable restraint of trade is either its object or effect. Times-Picayune Publishing Co. v. United States, 1953, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277. There is no evidence that the contracts were designed for the purpose of stifling free competition. Presently, the contracts have no effect whatever since under the federal mandatory allocation program the amount of motor fuel which plaintiffs and all other retail outlets receive is determined pursuant to FEO regulations. The present contracts may well expire before the federal allocation program is terminated and hence the maximum volume limitation which plaintiffs challenge may never have any effect. When the mandatory allocation system

11. See findings of fact 32 and 33.

is terminated, gasoline may be so plentiful that Exxon will be willing to supply plaintiffs with an unlimited quantity. Furthermore, since the contracts do not constitute *per se* violations, there can be no Section 1 violation until Exxon has used available gasoline, which it refuses to sell to plaintiffs in accordance with the contractual maximum established, in furtherance of an illegal restraint of trade. Until Exxon has treated its own stations or new customers in a more favorable manner than it treats independent dealers in order to dominate the market or otherwise restrain trade, the contracts cannot be held violative of Section 1. It should be noted that the contracts challenged here, which reduced the maximum Exxon was obligated to supply from 150 percent to 105 percent of each dealer's 1973 gasoline volume, may increase competition in the market in that the lower maximums will free gasoline for distribution and sale that Exxon otherwise would have had to hold in reserve for possible use in fulfilling the contractual obligation imposed by the previous contracts which contained a higher maximum volume.

Plaintiffs have failed to prove that, once the federal allocation program has ended, they would in fact need more gasoline than Exxon would supply them under the present contract or, that if they did need more motor fuel, alternative sources of supply would not at that time be available. The contracts can be terminated by plaintiffs at any time on sixty days written notice. Plaintiffs' contentions with respect to the contracts are purely speculative.

In short, the maximum volume set in the contracts presently having no effect since plaintiffs' allocation of gasoline is determined by the Federal Energy Office and plaintiffs clearly having failed to show that the contracts in the future will stifle competition or otherwise restrain trade, the court holds that presently there is no refusal to deal emanating from the contracts and that any future refusal to deal beyond the maximum amount set in the contract would fall within the *Colgate* doctrine, United States v. Colgate & Co., 1919, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 *unless* it were proven *at that time* that the refusal was in furtherance of a restraint of trade. Thus, the court denies plaintiffs' request that the contracts be declared void as violative of Section 1.

## V. FEO REGULATIONS

Plaintiffs contend that Exxon's proposed allocation of gasoline for the new car wash violates the Emergency Petroleum Act of 1973, Pub.L.No. 93–159, 87 Stat. 627, and the FEO regulations promulgated thereunder. Specifically, plaintiffs contend that Exxon has improperly determined the base year volume of its new station, which they argue under FEO regulations is entitled to a much smaller allocation of gasoline. Defendant Exxon has filed an application with the FEO for approval of a base year volume for allocation purposes of 853,000 gallons and hence an average base monthly volume of 71,100 gallons for the new car wash station. The Federal Energy Office has not yet acted upon this application. Plaintiffs request that the court, in accordance with FEO regulations, set a proper base year volume for the new car wash, one that will preserve the competitive market positions of independent dealers which must compete with the new company-operated car wash.

The Federal Energy Office has primary jurisdiction of the issue of whether Exxon's proposed base year volume of 853,000 gallons complies with the Emergency Petroleum Act of 1973, supra, and the regulations the FEO has promulgated thereunder. In Far East Conference v. United States, 1952, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576, the Supreme Court defined the doctrine of primary jurisdiction as :

" . . . a principle, now firmly established, that in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discre-

tion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure." 342 U.S. at 574–575. Not only is the doctrine court-made but the original case creating the doctrine overrode explicit and unequivocal statutory provisions allowing the courts to act initially. Texas & Pacific Railway Co. v. Abilene Cotton Oil Co., 1907, 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553. The principal criterion in deciding whether the doctrine is applicable is not legislative intent but is judicial appraisal of need or lack of need for resort to administrative judgment. In a recent case, MCI Communications Corp. v. American Telephone & Telegraph Co., 496 F.2d 214, (3 Cir., filed April 15, 1974), the Court of Appeals for the Third Circuit held that a district court should have deferred to the appropriate administrative agency, the FCC, under the doctrine of primary jurisdiction and explained:

"The doctrine of primary jurisdiction has been developed by courts in order to avoid conflict between the courts and an administrative agency arising from either the court's lack of expertise with the subject matter of the agency's regulation or from contradictory rulings by the agency and the court. Under the doctrine, a court should refer a matter to an administrative agency for resolution, even if the matter is otherwise properly before the court, if it appears that the matter involves technical or policy considerations which are beyond the court's ordinary competence and within the agency's particular field of expertise."

The purpose of the primary jurisdiction doctrine is not to divide powers between courts and agencies but to determine which tribunal shall make an initial determination. The reason for the doctrine is not a belief that an agency's expertise makes it superior to a court; rather, the reason is that a court confronted with problems within an agency's area of specialization should have the advantage of whatever contributions the agency can make to the solutions.

The contention that the proposed base year volume for Exxon's new station violates the Emergency Petroleum Act and the FEO regulations promulgated thereunder, raising as it does the novel question of the proper method to determine the base year (1972) volume of a new station having no historical sales volume, would appear to be the very kind of claim to which the primary jurisdiction doctrine applies. The claim certainly raises an issue within the FEO's area of specialization, and a court should have the benefit of the agency's views on the issue before attempting a resolution. Moreover, since Exxon's application is now pending before the Federal Energy Office, the kind of conflict between the courts and an administrative agency that the primary jurisdiction doctrine was designed to avoid could result if the court now adjudicated the question. A court should not act upon a subject matter that is peculiarly within an agency's specialized field without taking into account what the agency has to offer; otherwise parties who are subject to the agency's continuous regulation may become the victims of uncoordinated and conflicting requirements.

A determination that an agency has primary jurisdiction does not necessarily mean that the court will refrain from deciding the claim before it; it may mean only that the court will post-

pone its action on the case before it until after the agency has made a designated determination. But in some circumstances the primary jurisdiction of an agency may result in the court dismissing the claim before it. The Supreme Court has stated:

"The very purpose of providing either an exclusive or an initial and preliminary administration is to secure the administrative judgment either, in the one case, in substitution for judicial decision or, in the other, as foundation for or perchance to make unnecessary later judicial proceedings." Aircraft & Diesel Equipment Corp. v. Hirsch, 1947, 331 U.S. 752, 767, 67 S. Ct. 1493, 1500, 91 L.Ed. 1796.

■ Plaintiffs' contention that the proposed base year volume for the new car wash violates the Emergency Petroleum Act of 1973 and the FEO regulations promulgated thereunder should be dismissed since the Federal Energy Office has primary jurisdiction of the issue, and since the plaintiffs brought this action solely under the Sherman Act which provides no jurisdictional basis for adjudicating such a claim.

The court would have had to decide the issue, of whether Exxon had determined the base year volume of its new station in accordance with FEO regulations, in order to resolve the antitrust claims *if* plaintiffs had proved a Section 1 violation, thereby forcing Exxon to rely on Section 210.77 of the FEO regulations which provides that compliance with FEO regulations is an affirmative defense to any action brought under the antitrust laws arising out of a failure to provide, sell, or offer for sale any product subject to regulation. FEO Reg. § 210.77, 39 Fed.Reg. No. 10, pt. III (January 15, 1974).[12] However, since plaintiffs failed to prove a Section 1 violation, the issue of an affirmative defense under the regulations does not arise in resolving the antitrust claims. Thus, the question of whether Exxon had determined the base volume for the new station in accordance with FEO regulations has not been adjudicated. Rather the court has determined in the context of the antitrust claims that the method used by Exxon to estimate sales volume for the new car wash was reliable and hence the resulting base year determination was reasonable from a marketing standpoint. Moreover, the court has found that the opening of the new car wash with the proposed base volume of 853,000 gallons of gasoline will not restrain trade in the relevant market in which it competes.

There is a serious jurisdictional question of whether plaintiffs would have standing to challenge the base year volume and hence allocation of Exxon's new station under the Emergency Petroleum Act of 1973 and the FEO regulations promulgated thereunder.[13] Since the Federal Energy Office has primary jurisdiction over the aforementioned question, and since this action is brought solely under the Sherman Act, this issue has not been reached.

---

12. FEO Reg. § 210.77 provides: "Compliance with the provisions of the regulations of this chapter shall make available a defense to any action brought under the antitrust laws or for breach of contract in any Federal or State court arising out of delay or failure to provide, sell, or offer for sale or exchange any product subject to these regulations; provided, that such defense shall be available only if such delay or failure was caused solely by compliance with the provisions of this chapter."

13. In Brennan Petroleum Products Co., Inc. v. Pasco Petroleum Co., Inc., 373 F.Supp. 1312 (D.Ariz., 1974), the court held that plaintiffs, motor gasoline retailers, who contended that their supplier in violation of FEO regulations was not providing them with the proper volume of gasoline, had standing under the Emergency Petroleum Act of 1973 to seek injunctive relief against the supplier in federal court. The present case is distinguishable in that the issue here is whether plaintiffs would have standing under the Emergency Petroleum Act to challenge the base volume and hence allocation of *another* gasoline station, not their own.