**Robert J. THOMAS et al.**

v.

**AMERADA HESS CORPORATION et al.**

**Civ. A. No. 73–277.**

United States District Court,
M. D. Pennsylvania.

Jan. 17, 1975.

Roger Mattes and W. Boyd Hughes, Scranton, Pa., for plaintiffs.

John R. McConnell, Philadelphia, Pa., for Amerada Hess Corp.

Andrew Hailstone, Scranton, Pa., for Ashland Oil, Inc.

James M. Scanlon, Scranton, Pa., for British Petroleum.

L. Carter Anderson, Philadelphia, Pa., for Cities Service Co.

Joseph J. Heston, Wilkes-Barre, Pa., for Continental Oil Co. & Southern Facilities, Inc.

Hugh F. Mundy, Wilkes-Barre, Pa., for Murphy Oil Corp.

Sheldon Rosenberg, Scranton, Pa., for Phillips Petroleum Corp.

Joseph E. Gallagher, Scranton, Pa., for Chevron.

Charles I. Thompson, Jr., Philadelphia, Pa., for Tenneco Oil Co.

Richard G. Schneider, Philadelphia, Pa., for Getty Oil Co.

## OPINION

BECHTLE, District Judge.*

This matter is before the Court on the motions of defendants remaining in the action for summary judgment in a private civil action for damages based upon alleged violations of several statutes. These are §§ 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2); § 2 of the Clayton Act, as amended by § 1 of the Robinson-Patman Act (15 U.S.C. § 13); § 3 of the Clayton Act (15 U.S.C. § 14); and, § 210(a) of the Economic Stabilization Act of 1970, 83 Stat. 377 (12 U.S.C. § 1904 note). For reasons hereinafter stated, the motions will be allowed.

The original complaint, filed May 25, 1973, charged seventeen oil companies, a parent corporation of an oil company, two pipelines, an owner of a petroleum terminal facility, and a distributor of petroleum products [1] with combining and

---

* Louis C. Bechtle is a Judge of the United States District Court for the Eastern District of Pennsylvania specially assigned to hear this case.

1. (A) In alphabetical order, the seventeen oil companies are listed as follows: Amerada Hess Corporation ("Hess"); Ashland Oil, Inc. ("Ashland"); Atlantic Richfield Company ("Arco"); British Petroleum Co.; Continental Oil Co. ("Conoco"); Exxon Corporation ("Exxon"); Getty Oil Company ("Getty"); Gulf Oil Corporation ("Gulf"); Mobil Oil Corporation ("Mobil"); Murphy Oil Corporation ("Murphy"); Phillips Petroleum Corp. ("Phillips"); Standard Oil Co. of California; Standard Oil Co. of Indiana; Standard Oil Co. of Ohio ("Sohio"); Sun Oil Co. ("Sunoco"); Tenneco Oil Co. ("Tenneco"); and Texaco, Inc. ("Texaco").

The following substitutions have been made: Amoco Oil Co. ("Amoco") for Standard Oil Co. of Indiana; BP Oil, Inc. ("BP"), successor to BP Oil Corporation, for British Petroleum Co.; Chevron Oil Co. ("Chevron") for Standard Oil Co. of California; Sun Oil of Pennsylvania ("Sunoco of Pa.") for Sunoco.

conspiring in restraint of trade by monopolizing and attempting to monopolize the Scranton/Wilkes-Barre, Pennsylvania, gasoline market area (Lackawanna and Luzerne Counties) and conspiring to destroy the independent retail segment of that two-county market area by depriving plaintiffs of gasoline.

Extensive pretrial discovery running into the thousands of pages has been conducted by plaintiffs and defendants, including the deposition of fifteen witnesses, eleven of whom were examined by plaintiffs. Neither side can validly claim a lack of opportunity to show the existence or nonexistence of material fact in support of their claim.

The plaintiffs are four in number. Two of them, Joseph Hrobuchak and his wife, trading as Save-Way (sometimes hereinafter referred to as "Hrobuchak") are independent marketers of gasoline in the two-county area. The other two, Robert J. Thomas and his wife, trading as The 89-er (sometimes hereinafter referred to as "Thomas") are former independent retail marketers of gasoline in that area. Within that area, there were at least sixteen independent unaffiliated service stations in April of 1973.

Generally, an independent marketer of gasoline is one who operates a retail gasoline service station under his own trade name, buying unbranded regular-grade gasoline on a load-to-load basis and selling it under the trade name of the station without reference to the trade name or trademark of the supplier. He is a freelancer, staying clear of binding written agreements with his supplier, and thus avoiding exclusive supply requirement conditions and resale restrictions. In this way, he is free to select the supplier that gives him the most advantageous deal possible in the area of price, credit terms, and promptness of delivery. Occasionally, he will deal with more than one supplier to insure a ready volume of gasoline for his station even though the other gives the better bargain. He controls the conditions and appearance of his station and his hours of operation. He resells for cash at prices somewhat lower than that prevailing for regular-grade gasoline sold under a brand name by his nearby competitors.

In times when scarcity of gasoline exists, unless there is Government intervention, the independents (having no contractually enforceable supply rights against the supplier) are usually the first to suffer by having their gasoline deliveries cut off or drastically reduced because of the suppliers' contractual demands that must be honored first.

No gasoline refinery is located in the two-county market area. The nearest ones are in Rahway, New Jersey, and Philadelphia, Pennsylvania, approximately 90 and 100 miles away, respectively. Some of the oil companies, such as Arco, Gulf and Sunoco of Pa., bring their own refined products into the area by tank trucks for the benefit of their branded dealers. Others, such as Chevron, which has a refinery in Perth Amboy, New Jersey, and Exxon which has the one in Rahway, transport their products over the Buckeye Pipeline ("Buckeye")[2] which starts in Linden, New Jersey, and has multiple terminals in Dupont, Lackawanna County, Pennsylvania. At the pipeline terminals, the products are placed in the local holding tanks of the transporter or the storage facilities of a distributor, such as Southern or Agway Petroleum Corp. ("Agway"). From the holding tanks, the products are loaded into highway tank

(B) Cities Service Co. ("Cities") is the parent of the wholly owned subsidiary Cities Service Oil Company ("Citgo").

(C) The two pipelines are Buckeye Pipeline and Mobil Pipeline Company.

(D) The petroleum terminal facility is Southern Facilities, Inc. ("Southern").

(E) The gasoline distributor was C. A. Borda, trading as C. A. Borda Company.

The defendants will hereafter be referred to in the abbreviated names, some of which are trade names, shown in quotes.

2. The products transported over this pipeline are gasoline, kerosene, and no. 2 fuel oil.

trucks for delivery to smaller distributors' storage tanks or directly to the retailer.

Some of the oil companies that have no nearby refinery but desire to sell gasoline in the vicinage have entered into exchange agreements with one or more of the other companies that do have such a facility or ready access to its output. In essence, these agreements provide that company "A", which has a refinery or large storage facilities nearby, is to make available in the area a certain amount of gasoline to company "B" in exchange for the same quantity in another area where company "B" has a refinery, large storage facilities, or access to a ready supply and company "A" does not. These agreements are made on condition that the exchanged product meets the specifications of each party. Allowances are made in the agreements for differences in transportation costs and incidental charges. It is apparent that company "B" could not compete profitably in the area without such an agreement. Sometimes a "B" oil company will assign a portion of the supply to which it is entitled under an exchange agreement to another company in exchange for an equal supply in another part of the country.

A number of oil companies, such as Arco, Exxon, Getty, Gulf, Sunoco of Pa. and Texaco, sell their products to branded stations only. Several of these companies took affirmative action during the years 1969 to 1973 to insure that their products did not reach the unbranded marketers.

It is difficult to pinpoint plaintiffs' Sherman and Clayton Acts antitrust claims against the defendants from the allegations of the complaint and the amendments to it. However, from the depositions of plaintiffs and their answers to interrogatories, it is apparent that their basic complaint is that immediately after April, 1973, Thomas was unable to obtain any gasoline for his business from the defendants while Hrobuchak was able to obtain a supply from Ashland but on "a ruinous allocation basis."

## PRESENT DEFENDANTS

During the pendency of this action, half or eleven of the original twenty-two defendants have been dropped from this case by stipulation of the parties. The remaining defendants are Chevron, Ashland, BP, Southern, Conoco, Murphy, Tenneco, Getty, Phillips, Hess and Cities. With the exception of Southern and Cities, they are integrated oil companies; that is, they are engaged in the exploration, importation, production, refining, transportation, and marketing of petroleum and its products, either by themselves or through subsidiaries.

Chevron is a California corporation with offices in Perth Amboy, New Jersey, and is a wholly owned subsidiary of Standard Oil Company of California. Since January of 1970, Chevron sold gasoline in the two-county area through some six or seven distributors only. There are twelve to fifteen service stations in the area selling Chevron branded gasoline (both premium and regular grades). Chevron does not operate any of them. They are supplied by distributors of Chevron. All of the gasoline that Chevron distributes in the area either by sale or through exchange agreements comes from its Perth Amboy refinery through Buckeye to its Dupont terminal in Avoca, Pennsylvania. It is by far the largest supplier of unbranded gasoline in the area and has exchange agreements with Agway, BP, Hess and Tenneco. For some time prior to April of 1973 and until the Federal mandatory plan went into effect, Chevron imposed a "voluntary" allocation program on its distributors and companies under exchange agreements.

Ashland is a Kentucky corporation with its general offices in Ashland, Kentucky. Its nearest refinery is in Buffalo, New York. It sells and distributes gasoline in over 20 states, including Pennsylvania. It is probably the largest supplier of gasoline to private customers

in the areas where it distributes gasoline. Only a minor share is sold under the Ashland banner. It has been a supplier in the two-county area for over seven years. By the summer of 1972, it was supplying well over a million gallons of gasoline each month to unbranded gasoline outlets in the area. It obtained the unbranded gasoline it sold in the area under an exchange and terminalling agreement with Agway. Ashland has no contractual arrangements, written or oral, with any of its sixteen customers which obligated either the customer to purchase from Ashland or obligated Ashland to supply the customer on a continuing basis. Prior to imposition of the "voluntary" allocation program by Ashland, customers were free to order gasoline when they saw fit. In October of 1972, Ashland realized it would have less gasoline for distribution in 1973 than in the previous year. It, therefore, instituted an allocation program in that month. Under that program, it continued to supply its regular customers who had purchased gasoline in any of the base period months of May through August, 1972, but on a percentage of the average monthly gallons purchased. For the last three months of 1972 and the first three months of 1973, it was 100% of that average. Thereafter, until the Federal mandatory program went into effect, the limit fluctuated each month between 75% and 50% of the base average. Consequently, in 1973, it delivered less gasoline to its customers than in the corresponding months of 1972. The number of gallons delivered in April, May and June of 1972 were 1,143,659; 1,329,892 and 1,354,890, respectively. For 1973, it was down to 871,845; 804,256 and 552,496, respectively. With the commencement of its voluntary self-imposed allocation program, Ashland refused to take on any new accounts because of the unfair effect this would have on its regular customers who had purchased from Ashland during the base period. During the base period (May through August, 1972), Ashland was supplying at least

sixteen independent private brand gasoline stations in the area. Save-Way was one of the sixteen. Between August, 1972, and January, 1973, one of the sixteen became a major brand distributor and voluntarily ceased buying from Ashland. With the exception of a station which discontinued operations because of the death of one of its owners, Ashland continued to supply its remaining customers throughout 1973 on this allocation basis.

BP is the successor to BP Oil Corporation, a Delaware corporation with its main office in Wilmington, Delaware. BP Oil Corporation entered the market area on March 4, 1969, by purchasing the marketing assets formerly owned by Sinclair Oil Corporation for $400,000,-000. At that time, Sinclair Oil had an exchange agreement with Chevron for the supply of gasoline to Sinclair Oil and its customers out of Chevron's Dupont terminal. BP Oil Corporation continued the exchange agreement, since its nearest refinery and terminal are too far removed from the area. Therefore, the gasoline it distributed in the area was obtained from the Dupont terminal. On January 1, 1970, BP Oil Corporation became a wholly owned subsidiary of Sohio. BP, on December 31, 1973, after this action was instituted, acquired all the assets of BP Oil Corporation. BP, as did its predecessor, markets its gasoline through (a) branded distributors, (b) branded dealers, and (c) to the public through company-owned branded service stations. Prior to April 6, 1973, BP Oil Corporation, without benefit of contract, marketed a relatively small amount of unbranded gasoline to unbranded dealers. C. A. Borda Company ("Borda") was such a dealer and its only one in the area.

Southern was incorporated under the laws of Delaware for the acquisition and construction of terminal facilities. It does not produce, refine, or market petroleum products. Conoco, Murphy, and Tenneco each own one-third of the capitol shares of Southern. In May of 1972,

it purchased one of the Buckeye automated terminal and storage facilities in Dupont, Pennsylvania, from Getty. The terminal facility was then leased to the shareholders and, pursuant to an agreement among the three, operated by Conoco. Since the sale, Getty has not obtained gasoline from those facilities nor consigned any gasoline to another defendant.

Conoco is a Delaware corporation with its main office in Stamford, Connecticut. Although it markets gasoline in many states of the United States, it does not do so in the two-county area. It is the owner of a subsidiary, Kayo Oil Company ("Kayo"), a corporation engaged exclusively in the retailing of gasoline and related products through limited service stations. Kayo operates a number of these stations in the area and they are supplied with gasoline by Conoco. One of the Kayo stations is located on a site across the highway from the Save-Way station in Clark Summit (South Abington), Pennsylvania. The decision to build and operate the station on that site was made by Kayo *before* Hrobuchak purchased the Save-Way station. In May of 1972, Conoco acquired a one-third interest in Southern for the purpose of reducing its transportation costs in supplying gasoline to the Kayo stations in Pennsylvania. In this area, Conoco gets its gasoline from Chevron under an exchange agreement.

Tenneco is a wholly owned subsidiary of Tenneco Corporation which, in turn, is a subsidiary of Tenneco, Inc. Its main offices are in Houston, Texas, and the nearest refinery is in Chalmette, Louisiana. In the market area, it is an unbranded wholesale marketer of gasoline. It sells without any restriction as to resale to retail outlets, like plaintiffs, who resell to the public under their own trade name. It has never done business with any of the plaintiffs. Tenneco's primary source of supply of gasoline for distribution in the area is its own refinery in Louisiana. It has exchanged agreements with Conoco, Getty, and Cities.

Murphy, a Delaware corporation, with its main offices in El Dorado, Arkansas, has not participated in the marketing of gasoline in the area. Its sole connection with the area is as a shareholder owning one-third of the stock of Southern.

Getty is a Delaware corporation with a refinery in Delaware City, Delaware. In the mid-60's, Tidewater Oil Company decided to reconfigure geographically and to sell only through "Tidewater" branded dealers. In 1967, it terminated the contract of its principal distributor in the area. On September 30, 1967, Tidewater Oil Company merged into Getty, which continued the sales policy of Tidewater but under the Getty name. In 1969, Getty decided to market only "premium" grade gasoline. On March 31, 1972, the eastern marketing and manufacturing functions of Getty were transferred to Getty Eastern Operations, Inc. By April, 1972, only seven Getty branded dealers remained in Lackawanna and Luzerne Counties. All these stations are located at least 25 miles from those of plaintiffs. On February 29, 1972, Getty's refinery in Delaware caught fire and its supply of gasoline for distribution was severely impaired in 1972 and 1973. As a result, it introduced its own allocation program on April 19, 1973, designed to distribute its scarce supply equitably to its then-existing customers.

Phillips is based in Bartlesville, Oklahoma. It has six domestic crude oil refineries, all of which are located west of the Mississippi River. Around 1961, Phillips initiated an attempt to expand its marketing of gasoline and fuel oil into the northeastern part of the United States, an area which includes the two-county area of Lackawanna and Luzerne. The attempt was implemented largely by contracting with wholesale distributors who purchased the gasoline from Phillips and then resold it to their own customers. Some additional marketing was

ultimately done in the area to so-called direct dealers. Phillips supplied two branded wholesalers, Union Petroleum Company and Lapera Oil Company ("Lapera"), and two branded dealers in the area. Phillips obtained its gasoline for the two-county area from Conoco under an exchange agreement. In June of 1972, it began to withdraw from the northeastern sector for economic reasons and not because of a shortage of gasoline supply. By the end of September, 1972, it had stopped supplying these stations by agreement. They are now being serviced by other wholesalers. Three days before the contract to supply Lapera was to expire on December 31, 1972, Lapera petitioned this Court for an extension of the supply but was unsuccessful (C.A. No. 72–652). The case was discontinued with prejudice at the request of Lapera's counsel. Lapera is now being supplied by Amoco, one of the dismissed defendants. Union Petroleum Company ("Union") had a supply contract which could not be terminated by Phillips before August 31, 1973. Union is presently being serviced with gasoline by Phillips under the Federal mandatory allocation programs. The plaintiffs never requested Phillips to supply them with gasoline.

Hess is a Delaware corporation with offices in New York City and Woodbridge, New Jersey. In 1969, Hess Oil and Chemical Corporation with a refinery in Port Reading, New Jersey, was merged into Hess. One of its subsidiaries operates a large refinery in the Virgin Islands. It does not sell gasoline to any retail outlet in the market area. It does supply Berkshire Oil Company, a distributor located in Reading, Pennsylvania, approximately 75 miles from Scranton. It is able to do this by reason of an exchange agreement with Chevron. Berkshire Oil Company supplies, among other outlets, three service stations in the area displaying the Hess trademark. Hess does not own the three service stations.

Cities is a Delaware corporation with offices in New York City. It is the parent of the wholly owned subsidiary Cities Service Oil Company ("Citgo") which operates refineries in East Chicago, Indiana, and Lake Charles, Louisiana, and markets Citgo branded gasoline in the two-county area. Citgo has not been made a party defendant to this action. Plaintiffs have set forth no facts nor reasons why this Court should disregard the corporate entity of Citgo.

## OPERATIVE FACTS CONCERNING THE PLAINTIFFS

Joseph Hrobuchak, with his wife, owns a gasoline service station where they have been selling unbranded gasoline under the trade name Save-Way since May, 1971. The station is located on Routes 6 and 11, in Clarks Summit (South Abington), Lackawanna County, Pennsylvania, five miles north of the City of Scranton. Unlike the other two plaintiffs, the Hrobuchaks have divided the bulk of their wholesale purchases between two principal suppliers of unbranded gasoline (Ashland and Borda) with an occasional purchase from three unbranded distributors. Shortly after receiving the notice from BP that its supply would be cut off as of April 7, 1973, Borda ceased doing business and no longer supplied the Save-Way station with gasoline. Ashland, however, continued to supply the station in accordance with its voluntary allocation program.

During the base period of Ashland's voluntary program, Hrobuchak had chosen to purchase 43% of his gasoline from Ashland while obtaining the rest from Borda. For the calendar year 1973, Hrobuchak received 329,067 gallons of gasoline from Ashland. This amount was 26,317 gallons over his allotment for that year. The latter amount was, therefore, deducted from the volume which was delivered to the Save-Way by Ashland in 1974.

After April, 1973, Hrobuchak sought other suppliers to augment his diminished supply, but the oil companies con-

tacted by him were not taking on any new accounts at that time. Some of these companies would not have sold him any gasoline because of their policy of supplying only those stations at which the gasoline would be sold under the supplier's brand name. Hrobuchak was able to make up in part for the loss of the Borda supply and the reduced Ashland monthly shipments by obtaining intermittent tank truck loads from two other sources, Bowman Petroleum and John T. Howe. These supplies were insufficient to meet Hrobuchak's retail sales demand but permitted him to stay open about one-third his previous hours and days. Prior to April, 1973, he was able to get all the regular grade, unbranded gasoline he needed.

For the years 1971, 1972, and 1973, Hrobuchak's volume purchases of gasoline, the suppliers, the gross receipts, and net profits from selling gasoline at his Save-Way station were as follows:

| Year | Supplier | No. Gals. | % of Total | Total Gallons | Gross Receipts | Net Profits |
|---|---|---|---|---|---|---|
| 1971 (Last 9 Mos.) | Borda | 323,131 | 52% | | | |
| | Ashland | 287,328 | 46% | | | |
| | Townline Oil Co. | 10,700 | 2% | 621,159 | $182,347 | $ 8,261 |
| 1972 | Borda | 490,395 | 51% | | | |
| | Ashland | 469,252 | 49% | 959,647 | $277,954 | $13,858 |
| 1973 | Borda | 141,878 | 20% | | | |
| | Ashland | 329,067 | 47% | | | |
| | Bowman | 176,003 | 26% | | | |
| | Howe | 49,800 | 7% | 696,748 | $173,000 | $15,000 |

Although his total gallon purchases for 1973 were approximately 73% of his previous year volume, Hrobuchak's net profit for that same year increased by more than 8% over the 1972 net.

Until April of 1973, Robert J. Thomas, with the aid of a single employee, operated an independent gasoline service station under the name The 89'er located at 201 North Main Street, Old Forge, Lackawanna County, Pennsylvania, about 10 miles from Scranton. Thomas and his wife purchased the station from William Hrobuchak in 1952. They started out as an Esso (former trademark of Exxon) brand station. In 1955, they began operating as an independent unbranded station. From 1963 to 1966, Thomas bought his gasoline from Royal Sales, a Chevron distributor in the market area. After voluntarily discontinuin to buy from that distributor, he turned to Durso Sales. The latter, which obtained its gasoline from Ashland, supplied him with that product until the early part of 1970, when it ceased to do business for financial reasons. Thomas then purchased his supply from Ashland until April of 1972 when he switched to Borda because his price was lower than what Ashland was charging. From April to August of that year, salesmen from Ashland continued to call upon Thomas in unsuccessful attempts to place an order with The 89'er.

Around April of 1973, upon being notified by Borda that it could no longer honor orders for gasoline, Thomas, who had no other alternative supplier at that

time, called a number of companies that supplied gasoline in the area. Those companies gave him the same information they related to Hrobuchak—they were not taking on any new accounts at that time. Ashland refused to supply Thomas with gasoline under its voluntary allocation program because he was not a customer of Ashland during the four months base period of May, June, July, and August of 1972. Being unable to obtain gasoline for his station, Thomas shut down The 89'er. Prior to April, 1973, Thomas was able to buy all the regular grade gasoline he could sell.

On May 25, 1973, the plaintiffs filed their original complaint in this action. Both Robert J. Thomas and Joseph Hrobuchak admitted during the course of their depositions that the only reason why any given defendant was joined in the action was because it either did not sell gasoline or refused to sell to them after April of 1973.

In 1971, Thomas had inquired about becoming a branded station for Mobil, but that oil company chose another station in the area operated by the son-in-law of Robert J. Thomas. The latter station was selected because it had three bays for car repair and inspection work, whereas The 89'er had none. Also, by that year, Thomas' station had become rundown, and of the eleven gasoline pumps installed in the station in 1955, only three or four were operational in the period since 1969. Though Thomas was always able prior to April, 1973, to obtain all the unbranded regular grade gasoline he could sell, according to Thomas' income tax returns, his net income from the sale of gasoline was not in a bracket which would make his competitors envious. His net annual income from the business between 1961 and 1972 averaged less than $3,000. His best year was 1968 with a net of $3,751.

After that year, except for 1970, there was a steady decline: In 1969, it was $2,642; 1970, $2,762; 1971, $1,791; and 1972, $1,698. He attributes this decrease in his business to the intense competition in the retail gasoline market in the area.

Thomas had been willing to sell his station and retire from the business since 1968. The station has remained closed since April of 1973. Financially, the change from running the station to retirement was not hard to take for him. Thomas and his wife presently receive Social Security benefit payments totalling $3,200 a year. This sum is $551 shy of the net amount earned by the station in the best year. His employee, Miss Josephine Ward, who worked at the station for 21 years, is also retired and receiving Social Security benefits.

After January 15, 1974, when the Federal Mandatory Petroleum Products Allocation Program went into effect, Ashland continued to supply Hrobuchak with gasoline but under the Federal program. Even though BP was never a supplier of the Save-Way station, it was ordered on April 18, 1974, by the Federal Energy Office to be a co-supplier of that station based on the amounts of gasoline it purchased from Borda, since the latter had gone out of business. Based on Thomas' February, 1972, purchases which were within the Federal regulations base period, Ashland offered to supply them with gasoline under the Federal program and did send a tank truck load to The 89'er station in February, 1974. When Ashland discovered that Thomas had not reopened his station and had assigned the load to another station in apparent violation of § 211.24(a) and (b) of the Federal regulations,[3] Ashland notified Thomas it would no longer deliver gasoline to his station under the Federal mandatory

---

3. See, § 211.24(a) and (b) of 39 Fed.Reg. No.10 (Jan. 15, 1974). These subsections state that the right to receive an allocation is non-assignable and that marketers who have gone out of business shall not be eligible for allocations based upon volumes of purchases prior to going out of business.

program. Thomas did not file any protest or take any other action with the Federal Energy Office.

## I. *Plaintiffs' Motion for Voluntary Dismissal*

■ On July 22, 1974, fourteen months after bringing this action, plaintiffs filed a motion under Fed.R.Civ.P. 41(a)(2) for dismissal of the action *without* prejudice. This subdivision of Rule 41 provides that "an action shall not be dismissed at the plaintiff's instance save upon order of the court and upon such terms and conditions as the court deems proper . . ." The motion is filed after more than a year of extensive and costly pretrial discovery proceedings and following the filing by the remaining eleven defendants to this action of motions for summary judgment with voluminous supporting affidavits and memoranda on the facts and law.

Were this Court to allow plaintiffs' motion, it could in good conscience only do so and specify *with* prejudice or require the payment of defendants' costs, expenses, and counsel fees which to date are beyond plaintiffs' ability to pay.

■ The fact that motions for summary judgment have been filed; the extent of defendants' efforts and expenses already expended in preparation for trial; excessive and duplicitous expense of defending a second action; and not the least, insufficient explanation for the need to take a dismissal are factors to be considered in deciding a Rule 41(a)(2) motion. See, Pace v. Southern Express Company, 409 F.2d 331 (7th Cir. 1969); Harvey Aluminum v. American Cyanamid Co., 15 F.R.D. 14, 18 (S. D.N.Y.1953); 9 Wright & Miller, Fed. Pract. & Proc. § 2364. Motions for summary judgment have been filed; and should they be denied, the case would be immediately thereafter listed for trial. Great effort and expense have been expended by defendants, not only in re-

sponse to plaintiffs' comprehensive discovery requests, but in obtaining admissions from them used as a basis for their summary judgment motions. To require the defendants to defend a similar case at another time might necessitate a similar outlay of effort and expense. Obviously, a second try would give plaintiffs additional time for pursuing discovery with the experience of the first behind them, but possible smoother sailing in another venture is insufficient reason for permitting them to start anew. To the extent that plaintiffs have failed to complete discovery to their satisfaction in this action, it is due to their own dilatoriness in failing to pursue further depositions after they had a reasonable time to study documents and information produced by defendants. Plaintiffs' motion will be denied.

## II. *The Conspiracy Claim: § 1 of the Sherman Act, 15 U.S.C. § 1*

Plaintiffs have no direct proof of a conspiracy or concerted action by the defendants not to deal with them. They rely mainly upon an inference to be drawn from the fact that all of the defendants, with the exception of Ashland, refused to supply the Save-Way station with gasoline, and all contacted defendants turned down the requests for gasoline on behalf of The 89'er station. Ashland has continued to supply the Save-Way station but, as it has with all of its customers, on an allocation basis.

■■ Both before and after April of 1973, the branded oil companies would not deal with plaintiffs because these companies adhered to a policy of supplying stations that would sell only under their banners. Exclusive dealings or refusals to deal are not *per se* violations of § 1 of the Sherman Act. Absent acting in concert or monopolistic pursuits, a supplier of a product "other and equivalent brands of which are readily available in the market" may deal with selected outlets only. This practice is not

considered to be an unreasonable restraint of trade. United States v. Arnold, Schwinn & Co., 388 U.S. 365, 376, 87 S.Ct. 1856, 1864, 18 L.Ed.2d 1249 (1967). Refusal to deal with an outlet for its failure to honor a tying arrangement, International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L. Ed. 20 (1947), or the use of methods which go beyond the simple refusal to sell to customers who will not resell at suggested prices, Federal Trade Comm. v. Beech-Nut Co., 257 U.S. 441, 453, 42 S.Ct. 150, 66 L.Ed. 307 (1922), are something else. These restrictions or methods are not claimed to be present in this case. Prior to April of 1973, the plaintiffs obtained all the unbranded regular grade gasoline they needed to meet consumer demand at their stations.[4] This was so even though they intentionally limited the number of their suppliers.

Circumstantial evidence may suffice to establish a conspiracy in restraint of trade but does not compel it. Treasure Val. Potato Bar. Ass'n v. Ore-Ida Foods, Inc., 497 F.2d 203, 208 (9th Cir. 1974). As Judge Raymond J. Broderick noted in North Penn Oil & Tire Co. v. Phillips Petroleum Co., 358 F. Supp. 908, 923 (E.D.Pa.1973): "The courts have consistently required more than the fact of refusals to deal by several companies to make out a case of a concerted refusal to deal." Parallel conduct, even consciously parallel conduct, cannot "supply a sufficient basis for submitting the question of preconcert to the jury, absent attendant circumstances making it unlikely that these parallel courses of action had resulted from the exercise of independent judgment by each manufacturer." Gold Fuel Service, Inc. v. Esso Standard Oil Co., 306 F.2d 61, 64 (3rd Cir. 1962).

The remaining defendants contacted by the plaintiffs say they had a legiti-mate reason for refusing to supply plaintiffs with gasoline after March of 1973. They maintain there was a shortage of gasoline in the area. When Hrobuchak was unable to replace the Borda supply and Thomas was unsuccessful in getting any gasoline, they then sued every oil company having any dealings in the area. Some of the defendants were not contacted until several months after suit. Some of the defendants have stated in their affidavits that the shortage of gasoline was their sole, and in the case of the remaining defendants who were branded suppliers an additional, reason for refusing to deal with plaintiffs. Congress has determined that a shortage of refined petroleum products "caused by inadequate domestic production . . . and the unavailability of imports sufficient to satisfy domestic demand, now exist or are imminent . . ." See § 2(a) of the Emergency Petroleum Allocation Act of 1973, 87 Stat. 628, 15 U.S.C. § 751(a)(1).[5] The mandatory Petroleum Products Allocation and Price Regulations of January 15, 1974, 39 Fed.Reg. No. 10, pp. 1924 et seq., were promulgated by authority of the 1973 Act (15 U. S.C. § 753) for the equitable distribution of petroleum products, including gasoline. Moreover, the existence of the shortage has been recognized by Federal Courts in various parts of the country even before Congress made its findings. See, for example, Davis v. Crown Central Petroleum Corporation, 483 F.2d 1014 (4th Cir. 1973)—involving two cases from North Carolina; North Penn Oil & Tire Co. v. Phillips Petroleum Co., supra, 358 F.Supp., at 908, 920, 922, 924—a case involving the eastern part of Pennsylvania; Romaco v. Crown Central Petroleum Corp., 1973—2 Trade Cas. ¶ 74,612 (M.D.Ala.1973). In the last cited case, the court felt that during a period of a gasoline shortage it was

---

4. At their depositions, plaintiffs freely admitted that they were hounded continuously for orders by salesmen of the various unbranded sellers of gasoline in the area.

5. The Act applies to unbranded independent retail marketers of gasoline such as plaintiffs.

only natural for suppliers of gasoline to first curtail their noncontractual customers and found that such action did not constitute any antitrust violation. *Id.* at 95,074. Also, in a Sherman Act antitrust action closer to home to restrain an oil company "from opening a new company-operated car wash gasoline station with a base year volume of 853,000 gallons of motor fuel" after June of 1973, this Court on May 10, 1974, concluded that "the opening of the new station is likely to increase competition in the market in which it will compete by making available to consumers an additional supply of motor fuel at a time when there is *still a shortage*" of motor fuel in the market area of Cumberland County, Pennsylvania. (Italics added.) Quigley v. Exxon Company U. S. A., 376 F.Supp. 342, 352 (M.D.Pa. 1974).

■ To support their argument that a reasonable inference of concerted action may be drawn in this case, the plaintiffs point out that (1) a number of the defendants "jointly" use the pipelines and loading facilities at the Dupont, Pennsylvania, terminal; (2) some of the defendant oil companies have entered into exchange agreements; and, (3) some of the defendant oil companies' branded stations honor the credit cards issued by Phillips. We conclude that these factors, taken singly or together, are not enough to submit the case to the jury on the issue of concerted action.

■ Regarding the joint use of the two pipelines, plaintiffs were apparently not aware of the fact at the time they brought suit that pipelines are operated as common carriers. See, Rights-of-way for pipe lines section of the Leases and Prospecting Permits Act of 1920, as amended, 30 U.S.C. § 185. As such, they are subject to the Interstate Commerce Act, 49 U.S.C. § 1(3)(a). The pipelines may not legally refuse to carry fluid products when requested to do so by producers. Denver Petroleum Corporation v. Shell Oil Company, 306 F.Supp. 289 (D.Colo.1969). "Joint" use of pipelines and terminal loading facilities simplifies the flow of gasoline into a pipeline terminal area. If the use of the pipelines were restricted to a few oil companies, the independent unbranded marketers would either be foreclosed from a supply of gasoline or find it more difficult to get an adequate supply. Refiners may not insist that the pipelines retain their products in the pipelines until they are ready for use. Large holding tanks at the terminal ends are a necessity. Sharing access to these tanks should not be a ground for drawing unfavorable inferences. The plaintiffs seem to have conceded as much by dropping the pipeline companies as party defendants.

■ Something more than mere mutual dealings by competitors must be shown to establish a violation of an antitrust law. Independent Iron Works, Inc. v. United States Steel Corp., 322 F.2d 656, 667 (9th Cir. 1963). The exchange agreements here were used to facilitate the distribution and marketing of gasoline in the area. They were used to aid the independents in securing unbranded regular grade gasoline. It was because of suppliers who obtained their gasoline by benefit of the exchange agreements that plaintiffs were in fact able to stay in business in the area. No inference of a conspiracy not to supply them with gasoline may be drawn from the exchange agreements.

In the case of North Penn Oil & Tire Co. v. Phillips Petroleum Co., *supra* 358 F.Supp. at 918, the court held the evidence insufficient to support a finding of a reasonable probability that North Penn Oil & Tire Company would succeed in proving the alleged conspiracy among the major oil companies to eliminate jobbers in the area in the claimed effort to gain price control and market allocations even though Phillips had announced that its issued credit cards may be used at Exxon and Getty retail stations in the areas from which Phillips has with-

drawn in the northeastern part of the United States.

■ Phillips, like most other branded oil companies, has issued credit cards to a number of automobile owners.[6] It has informed the Court through affidavits that in mid-1971 it began withdrawing from the marketing of gasoline in a designated section of the northeastern United States that includes the counties of Lackawanna and Luzerne and that the cutback has proceeded as quickly as its contracts with distributors and dealers would permit. Plaintiffs have offered no counter-affidavits disputing the withdrawal. The fact that Exxon and Getty attempted to attract consumers of Phillips-brand gasoline by honoring Phillips-issued credit cards in the northeast sector of the county is an insufficient evidentiary basis for an inference that the defendants agreed not to deal with plaintiffs and, in the case of Ashland, to curtail gasoline deliveries. Agreements between oil companies to recognize one another's credit cards are a convenience to the motoring public and foster competition.

It is difficult to believe that ten oil companies and the owner of a terminal facility would conspire to restrict the gasoline supply of just two out of eighteen independent unbranded dealers whose combined monthly purchases of gasoline were less than 100,000 gallons.[7] It would be wholly unreasonable to conclude on the basis of abstract advocacy alone that Ashland and other suppliers of unbranded gasoline to independent marketers would conspire with other oil companies, who supply branded dealers only, to eliminate dealers who do not sell branded gasoline, *i. e.*, the *independent* marketers. Ashland's self-interest lies upon strengthening the competitive vitality and viability of independent unbranded dealers. This is contrary to the alleged purpose behind the conspiracy, which was to eliminate the independent unbranded dealers.

### III. *The Monopoly Claim: § 2 of the Sherman Act, 15 U.S.C. § 2*

In their amended complaint, which merely elaborates on the broad allegations of the original complaint, plaintiffs charge that since January 1, 1969, Ashland, BP, Chevron, Cities, Conoco, Hess and Phillips participated in a "syndicate," aided and abetted by Murphy, Southern and others, to monopolize the sale of gasoline in the market area by delivering "their combined sales in the Scranton/Wilkes-Barre market to Chevron's refinery . . ." This they assert was accomplished through the use of exchange agreements whereby the supplying of the market area with unbranded regular grade gasoline was "allocated" to Chevron.

Chevron is the major supplier of unbranded regular grade gasoline in the area. This is due mainly to the proximity of its refinery to a pipeline with terminals in the area and, in part, to the policy of some of the dismissed defendants, Exxon for one, to sell to branded outlets only. The most economical way of transporting gasoline into the area is by pipeline. By reason of this economic

---

6. In an antitrust action, the two plaintiffs, each of whom was an independent dealer who operated an Exxon service station in Cumberland County, Pennsylvania, testified that approximately 65% of their gasoline sales are credit card sales. Quigley v. Exxon Company U. S. A., 376 F.Supp. 342, 351 n. 8 (M.D.Pa.1974).

7. That other independents were not eliminated in the two-county area during the period in question is made apparent by plaintiffs' answer to Conoco's Interrogatory 3–b, which requested them to set forth the factual basis for their allegation in paragraph 13 of the original complaint that 13 oil companies have by virtue of a combination and conspiracy in restraint of trade refused to deal with plaintiffs. Their answer is: "The defendants, including Continental, have refused to deal with Plaintiffs, Thomas and Hrobuchak, as to others whom Defendants have refused to deal with, this information is unknown . . . ."

edge, Chevron had a natural advantage over the sale of unbranded regular grade gasoline. Nevertheless, there has been no showing that Chevron obtained this favorable position illegally or that the refusal of any of its distributors in the area to supply plaintiffs was for the purpose of restraining trade unreasonably.

■ There is no indication that plaintiffs will be able to present sufficient evidence to show that others conspired with Chevron for the purpose of maintaining Chevron as the predominate supplier in the area. Exchange agreements are not *per se* illegal as a means of eliminating competition from a substantial market and dividing territories as plaintiffs earnestly suggest. On the contrary, they permit one refiner of gasoline to do business in the backyard of its competitor's refinery by the exchange of manufactured products. Blue Bell Co. v. Frontier Refining Co., 213 F.2d 354, 359 (10th Cir. 1954). Without the agreements, oil companies would be confined to selling gasoline in the area where their respective refineries are located and there would be an area of natural monopoly around each oil company's refinery, where only the owner of that refinery could economically afford to market gasoline. Companies with distant refineries would be unable to complete in the vicinity of another's; competition would exist only in fringe areas between refineries. Outlawing the exchange agreements would have a tendency to bring about a needless duplication of refineries with their accompanying drawbacks.

■ The exchange agreements involved here were not used for the purpose of handing over the market area to a selected supplier. They were used for the opposite end. The so-called selected supplier had a natural monopoly in the area without the agreements by reason of the pipeline. This supplier permitted other companies to sell gasoline in the area. They possessed no power to hand over the area to that supplier. Under the circumstances, no inference of an illegal monopoly or intent to monopolize, in violation of the antitrust laws, may be drawn from the use of the exchange agreements.

■ The fact that a number of gasoline suppliers, when faced with a shortage of impending scarcity, impose a rationing program on or allocate scarce supplies to their then-existing customers and meanwhile refuse to acquire new accounts is reasonable business behavior and will not supply a legal inference of an intent to monopolize. Independent Iron Works, Inc. v. United States Steel Corp., *supra* at 667–668.

Moreover, plaintiffs have not advised the Court in what way their stations were harmed by the agreements.

IV. *The Robinson-Patman Violation Injury Claims: § 2(a), (c), (d), (e) and (f) of the Clayton Act, as amended by § 1 of the Robinson-Patman Act, 15 U.S.C. § 13(a), (c), (d), (e) and (f)*

■ Plaintiffs have no valid claim against defendants under § 2(a) of the Clayton Act, as amended by § 1 of the Robinson-Patman Act, 15 U.S.C. § 13(a). This section makes it unlawful for a seller to discriminate in price between different purchasers of commodities of like grade and quality where the commodities are sold for use or resale within the jurisdiction of the United States "and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them . . ." Within the two-county area, Southern is the owner of a pipeline terminal facility; the other

defendants are sellers of gasoline to wholesalers and/or retailers; Conoco is also an operator of a pipeline terminal facility. Plaintiffs, as retailers, did not compete directly with the defendants. The requisite adverse effect on competition under the section, injury to a competitor of the seller, was not present. Plaintiffs, therefore, lack standing to assert a "primary-line" Robinson-Patman Act claim against them. Bolick-Gillman Company v. Continental Baking Company, 206 F.Supp. 151, 154 (D.Nev. 1961).

Plaintiffs' Robinson-Patman Act type claim, if any, must be a "secondary-line" competition injury claim based on discrimination between prices charged them by their immediate suppliers and prices charged competitor retail marketers by those same suppliers. The proscriptions of the Robinson-Patman Act do not apply to refusal to deal. A retail marketer of gasoline can have no right of action under § 2(a) of the Clayton Act unless he is an actual purchaser from the company charged with the discrimination. Klein v. Lionel Corporation, 237 F.2d 13, 14–15 (3rd Cir. 1956). The only named defendant who could possibly fit the description of such a supplier is Ashland. The plaintiffs have not presented a single affidavit setting forth the name of a service station owner in the area that has been the recipient of more favorable prices from Ashland than those charged plaintiffs. They attempt to overcome the fact that they did not purchase gasoline from the other defendants by alleging a "syndicate" of defendants which constitute "in reality only one seller." Since they have purchased from one of the defendants prior to suit and some of the other members of the alleged syndicate may have treated their customers more favorably than Ashland has treated the plaintiffs, they claim damages from all the remaining defendants. As noted earlier, plaintiffs have not shown that they are prepared to offer any evidence from which

a reasonable inference may be drawn that the alleged syndicate existed among the defendants. Moreover, any inference of competitive injury from Ashland's pricing policy would be negated by the fact that plaintiffs had available prior to April, 1973, comparable grade gasoline from other suppliers at prices equivalent to or lower than those charged by Ashland. See, Hanson v. Pittsburgh Plate Glass Industries, Inc., 482 F.2d 220, 227 (5th Cir. 1973).

Plaintiffs contend that the alleged syndicate has discriminated against them in the furnishing of services and facilities in connection with the purchase of gasoline for resale by affording other purchasers with credit card facilities, advertising benefits, allowances and other benefits not made available to them on proportionately equal terms in violation of § 2(c), (d), (e) and (f) of the Clayton Act, as amended. The purpose of § 2(c) is to prevent arrangements whereby large *buyers* exact price concessions or allowances disguised as commissions from sellers to be paid the buyers or their designated intermediaries, and thereby obtain discriminatory preferences over smaller buyers. Federal Trace Comm'n v. Broch & Co., 363 U.S. 166, 168–169, 80 S.Ct. 1158, 4 L.Ed.2d 1124 (1960). Also, § 2(f) has been described as "a provision under which proceedings may be had against *buyers* who knowingly induce or receive discriminatory prices." (Italics added.) Automatic Canteen Co. v. F. T. C., 346 U.S. 61, 62, 73 S.Ct. 1017, 1019, 97 L.Ed. 1454 (1953). Defendants are suppliers and not buyers within the meaning of the above sections.

Sections 2(d) and (e) prohibit promotional payment and concessions by suppliers to buyers (who buy for resale) for processing, handling, or selling of the suppliers' products except on proportionately equal terms. The former applies when the suppliers pay the buyers

and the latter when the suppliers perform the services for the buyers. What has been said about § 2(a) holds for these sections. The Supreme Court has ruled that § 2(d) reaches only discrimination between customers competing for resales at the same functional level. FTC v. Fred Meyer, Inc., 390 U.S. 341, 348–358, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968). This ruling obviously applies to § 2(e). See, National Auto Brokers Corp. v. General Motors Corp., 376 F.Supp. 620, 626–627 (S.D.N.Y.1974). Plaintiffs have not submitted any affidavits setting forth that Ashland has done what the above sections declare to be unlawful.

Plaintiffs are not entitled to recover from defendants for the asserted "secondary-line" Robinson-Patman Act injury claims.

V. *Exclusive Dealings Claim: § 3 of the Clayton Act, 15 U.S.C. § 14*

In their pretrial memorandum, the plaintiffs state:

"5. The members of said syndicate have required those purchasing from the syndicate on a 'branded' basis, to agree to restrictions involving the handling of the product sold—the effect of which is to prevent the purchaser from reselling the product so acquired to the plaintiffs on both a branded basis, in violation of § 3 of the Clayton Act and on a geographical basis, in violation of § 1 of the Sherman Act."

■ Section 3 of the Clayton Act, 15 U.S.C. § 14, commonly known as the "exclusive dealing" section of the antitrust laws, makes it unlawful to require a purchaser not to deal in the commodity of a competitior of the buyer. Actions under § 3 have been brought, not only by foreclosed competitors of the buyer, but also by purchasers of the buyer. Bales v. Kansas City Star Company, 336

F.2d 439, 444 (8th Cir. 1964). However, plaintiffs have not alleged in their complaint that they have been injured in their business or property by activities prohibited by § 3 of the Clayton Act. Such allegations are a prerequisite to the bringing of a private action allowed by § 4 of the Clayton Act, 15 U.S.C. § 15. McElhenney Co. v. Western Auto Supply Company, 269 F.2d 332, 338 (4th Cir. 1959). On this ground alone, the defendants would be entitled to summary judgment on the § 3 charge.

■ Standing to sue under § 3 of the Clayton Act has not been extended to those who are neither competitors of the alleged violating supplier nor themselves restricted purchasers. As mentioned earlier, defendants are producers or wholesale distributors. In contrast, plaintiffs are solely purchasers who resell to the public. They have introduced no facts that would give them standing to raise a claim under § 3 against defendants. Plaintiffs have never sold tires, batteries, and auto accessories; they are not suppliers of those products. With the exception of Ashland, they did not purchase from the defendants and Ashland has not imposed upon them any conditions, expressed or implied, as to the resale of gasoline. They have no claim against defendants under § 3 of the Clayton Act.

VI. *Predatory Price Discrimination Claim*

■ Plaintiffs allege that Conoco, in furtherance of the conspiracy to destroy the independent segment of the area, opened and operated (through Kayo) ostensibly independent retail outlets in the area. More specifically, they say that a Kayo service station located across the highway from the Save-Way station in South Abington, Pennsylvania, sold gasoline at an average retail price of four cents less than the price charged at the other four Kayo stations in Lackawanna

County. According to the Hrobuchak allegations, the lower prices were supported by the revenues received from the other stations in a deliberate effort to destroy their business and further centralize the gasoline market. Predatory price discrimination is forbidden by § 2(a) of the Clayton Act and § 3 of the Robinson-Patman Act, 15 U.S.C. § 13.

 Kayo, the corporation that owns and operates the station in question, has not been made a party to this action. There has been no showing that Kayo is the alter ego of Conoco. Even if it is assumed that Conoco owned and operated the station, plaintiffs do not deny that Conoco never sold them gasoline. They have no claim under § 2(a) of the Clayton Act. Klein v. Lionel Corporation, *supra*. Even if the syndicate existed, Kayo has submitted affidavits showing that it in good faith lowered prices to meet those of its principal competitor in the area, a Fisca service station located on Routes 6 and 11 about three miles south of the South Abington Kayo station. Plaintiffs have not proffered an opposing affidavit on this fact. Unless plaintiffs offer evidence to support a contrary finding, summary judgment procedure is appropriate to establish this defense. Cadigan v. Texaco, Inc., 492 F.2d 383, 385–386 (9th Cir. 1974). A private cause of action under the Clayton Act does not lie for sales at unreasonably low prices for the purpose of destroying competition or eliminating a competitor, which are forbidden only by § 3 of the Robinson-Patman Act. Nashville Milk Co. v. Carnation Co., 355 U.S. 373, 78 S.Ct. 352, 2 L.Ed.2d 340 (1958).

Moreover, a conclusion on the record before this Court that the complained of local activities of the defendants with regard to the distribution and sale of gasoline had a substantial impact on interstate commerce would be unreasonable. See, Gulf Oil Corporation, et al. v. Copp Paving Company, Inc., 419 U.S. 186, 201, 202, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974).

VII. *Economic Stabilization Act of 1970, as amended, Violation Claim*

Finally, plaintiffs allege that once the competition in the area was removed (that is, The 89'er station was eliminated and the gasoline supply of the Save-Way station limited), nine of the defendants (Ashland, Chevron, Cities, Conoco, Getty, Hess, Murphy, Phillips and Tenneco) have increased their price of gasoline many times in excess of the ceiling permitted by the Economic Stabilization Act of 1970, 84 Stat. 799, as amended, 12 U.S.C. § 1904 note (1974 Supp.), and the applicable price control regulations issued under authority of the Act. The allegations are apparently made pursuant to § 210 of the Act. This section permits a consumer to bring an action to recover (1) "not more than three times the amount of the overcharge," or (2) "not less than $100 or more than $1,000" from a seller who willfully violates the price control regulations. In the case of an overcharge not criminally willful, no action may be brought for the overcharge unless the consumer has first presented a claim for a refund to the seller and has not received repayment within ninety (90) days thereafter.[8] See, Legislative History to the Economic Stabilization Act Amendments, 1971 U.S.Code Cong. & Admin. News, pp. 2291 and 2310.

 Plaintiffs, prior to bringing this action, did not buy gasoline from

---

8. Section 218 of the Act, as amended, under the heading "Expiration" provides: "The authority to issue and enforce orders and regulations under this title expires at midnight April 30, 1974, but such expiration shall not affect any action or pending proceedings, civil or criminal, not finally determined on such date, nor any action or proceeding based upon any act committed prior to May 1, 1974."

any of the defendants except Ashland. A United States District Court has held that "the more practical and workable interpretation of § 210 is to limit standing in damage actions to purchasers of goods who have been overcharged by their immediate sellers." Arnson v. General Motors Corporation, 377 F. Supp. 209, 212 (N.D.Ohio, E.D.1974). The wording of the section and its meager legislative history appear to support this interpretation. However, this Court need not adopt that holding in ruling on eight of the defendants' motions for summary judgment. Plaintiffs have not demonstrated how they suffered a legal wrong or damages from the alleged overcharges of those eight defendants. They may not recover from them under the Act as amended.

■ Plaintiffs have not asserted that the alleged overcharges by Ashland were made willfully. In the absence of such an assertion in the complaint, it is necessary for them to aver that they have presented to Ashland a *bona fide* claim for a refund of the asserted overcharge or overcharges and that they have not received repayment "within ninety days from the date of the presentation of such claim." They omitted making such an averment in any of the documents filed with this Court—the complaint, the first and second amended complaints, and the pretrial memorandum. Until either of those essential averments is made, plaintiffs do not state a claim upon which the recovery of the alleged overcharge or overcharges from Ashland may be granted. Manning v. University of Notre Dame Du Lac, 484 F.2d 501 (T.E.C.A.1973).

■■ Plaintiffs have had four opportunities to plead "willfulness" as part of their claim or claims but omitted to do so in all of them. Repeated failure to cure deficiencies by amendments previously allowed is sufficient reason for exercising discretion denying leave to amend further. Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); Mooney v. Vitolo, 435 F.2d 838 (2nd Cir. 1970); Shall v. Henry, 211 F.2d 226, 231 (7th Cir. 1954). Further, in response to the several motions for summary judgment, they have not come forward with affidavits setting forth the price or prices they paid per gallon for the gasoline purchased from Ashland and the amounts, in their best estimates, representing the alleged overcharges and the dates on which they took place. They have been content to rely simply on general allegations that overcharges were made. Although the 1970 Act, as amended, does not include the common law defenses of *pari delicto* and "unclean hands" to an action to recover overcharges made in violation of the price control regulations, the violation of the very regulations by those seeking to recover those damages is, in my judgment, an important adverse factor in the consideration of whether to allow them to amend a complaint or file a supplemental pleading. Hrobuchak has testified at his deposition of January 10, 1974 (pp. 135–136), that to the extent that the operators of the Kayo station across the highway from the Save-Way station increased the retail price of gasoline, it enabled him to raise his selling price and thus his profits.

Accordingly, the claim under § 210 of the Act, as amended, will be dismissed without leave or permission to file an amendment or supplemental pleading to the "second amended complaint."